CITIZENS FOR A BETTER ENVIRON-
MENT, a not-for-profit corporation or-
ganized under laws of Illinois and Mar-
tin Wojcik, Plaintiffs,

v.

Douglas M. COSTLE, Administrator, Unit-
ed States Environmental Protection
Agency; and John McGuire, Regional
Administrator, Region V, United States
Environmental Protection Agency, De-
fendants.

INLAND STEEL COMPANY; Interlake,
Inc.; Jones & Laughlin Steel Corpora-
tion; National Steel Corporation; Re-
public Steel Corporation; United States
Steel Corporation; WSC Corp.; and
Youngstown Sheet and Tube Company;
Chicago Association of Commerce and
Industry; Illinois Manufacturing Asso-
ciation; Mid America Legal Foundation;
Indiana Legal Foundation, Intervenors,

v.

Douglas M. COSTLE, Administrator, Unit-
ed States Environmental Protection
Agency; and John McGuire, Regional
Administrator, United States Environ-
mental Protection Agency, Region V,
Defendants.

PEOPLE OF the STATE OF ILLINOIS,
ex rel. Tyrone FAHNER, Attorney Gen-
eral of the State of Illinois, and the
Illinois Environmental Protection Agen-
cy, Intervenors,

v.

Douglas M. COSTLE, Administrator, Unit-
ed States Environmental Protection
Agency, and John McGuire, Regional
Administrator, United States Environ-
mental Protection Agency, Region V,
Defendants.

No. 80 C 0003.

United States District Court,
N. D. Illinois, E. D.

April 15, 1981.

Robert Goldsmith, Robert E. Yuhnke, Chicago, Ill., for Citizens for a Better Environment and Martin Wojcik, plaintiffs.

Jose R. Allen, Dept. of Justice, Land & Natural Resources Div., Washington, D. C., Gail C. Ginsberg, Asst. U. S. Atty., Chicago, Ill., Susan B. Weinstein, Elizabeth Maxwell, Environmental Protection Agency, Chicago, Ill., for EPA and other federal defendants.

James T. Harrington, Clifton A. Lake, Laurence A. McHugh, Dixie L. Laswell of Rooks, Pitts, Fullagar & Poust, Alan I. Becker, Bowles & Ward, Chicago, Ill., William M. Wycoff, Peter G. Veeder, Chester R. Babst, III of Thorp, Reed & Armstrong, Pittsburgh, Pa., for intervenor Steel Companies.

John Van Vranken, Kenneth G. Anspach, Environmental Control Division, Asst. Attys. Gen., Chicago, Ill., for State of Ill., intervenor.

John M. Cannon, Susan W. Wanat, Mid-America Legal Foundation, Chicago, Ill., for

the Mid-American Legal Foundation, Chicago Assn. of Commerce & Industry, Illinois Mfrs. Assn., intervenors.

Richard J. Darko, Bingham, Summers, Welsh & Spillman, Bayh, Tabbert & Capehart, Jerry P. Belknap, Bryan G. Tabler, Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., for other intervenors.

## MEMORANDUM OPINION AND ORDER

### MORAN, District Judge.

Plaintiffs, Citizens for a Better Environment and Martin Wojcik, a citizen and resident of Illinois (hereinafter collectively referred to as "CBE"), have filed this action under § 304(a)(2) of the Clean Air Act, 42 U.S.C. § 7604(a)(2), against defendants Douglas Costle, the Administrator of the United States Environmental Protection Agency ("EPA") and John McGuire, EPA's Regional Administrator for Region V. CBE takes issue with the method employed by EPA to supervise compliance with the 1977 Clean Air Act Amendments with respect to the states of Illinois and Indiana. It seeks an order from this court directing defendants to promulgate federal regulations in lieu of certain portions of Illinois' and Indiana's state implementation plans ("SIP's") which allegedly fail to satisfy the requirements of the 1977 Act. 42 U.S.C. § 7401 et seq.

When EPA's original answer to CBE's complaint threatened to affect their interests adversely, certain of the region's steel companies, led by Inland Steel Company, intervened in this action both as defendants and cross-claimants.[1] In addition, the State of Illinois and certain other organizations representing private business interests were granted leave to intervene.[2] EPA and all of the intervenors except Illinois now have moved to dismiss CBE's complaint for lack of subject matter jurisdiction. The mov-

ants argue that the complaint does not allege the failure of EPA to perform any non-discretionary duty sufficient to permit a district court to entertain the action under § 302(a)(2). EPA also has moved to dismiss the intervenors' affirmative claims.

Resolving these motions is no easy task. As might be expected given the complexity of the Clean Air Act, each of the parties to the lawsuit has presented different theories regarding the jurisdictional question. And, initially, each of these theories has certain arguable merit. For the reasons which are more fully articulated below, however, the court concludes that it does have jurisdiction to consider CBE's claims with the exception of Count II. The ultimate relief sought by CBE may or may not be available to its full extent at this juncture. But, at the very least, this court has the power both under the Act and under more general concepts of jurisdiction, *Abbott Laboratories v. Harris*, 481 F.Supp. 74 (N.D.Ill.1979), to compel the Administrator to make certain preliminary determinations which the legislation itself instructed EPA to have made some time ago regarding whether Indiana's and Illinois' SIP's comply with the Act.

### A. STATUTORY BACKGROUND

The statutory framework of the Clean Air Act envisions a complex cooperative venture between the federal government and the individual states to remedy the existing problem of air pollution and prevent further deterioration of the environment. Originally enacted in the 1960's, the Act has undergone extensive revision in the past decade as theories of how best to effect the goals of the legislation have changed in response to political pressures and economic realities. It is the past two revisions of the Act, first in 1970 and again in 1977, that are of primary concern here.

---

1. Along with Inland, Republic Steel Corp., WSC Corp., United States Steel Corp., Interlake, Inc., Jones & Laughlin Steel Corp., National Steel Corp. and the Youngstown Sheet & Tube Company (hereinafter collectively referred to as "Steel") have been granted leave to intervene herein.

2. The additional intervenors include the Chicago Association of Commerce and Industry, the Illinois Manufacturer's Association, the Mid-America Legal Foundation and the Indiana Legal Foundation (hereinafter collectively referred to as the "private intervenors").

The 1970 Amendments to the Clean Air Act divided responsibility for plans to clean the air between the federal and state governments. The hallmark of the statute was, to its proponents, its undiluted dedication to repairing the environment; to its detractors, its unrealistic intractibility in pursuit of these goals. The Act initially required the EPA Administrator to establish national primary ambient air quality standards ("NAAQS") for a series of pollutants such as carbon monoxide and suspended particulate. § 109, 42 U.S.C. § 7409. Once EPA had established these air quality standards, the individual states were required to design and submit to the Administrator state implementation plans aimed at accomplishing these standards by the end of 1977. The states were not left to guess at what was required of them in their SIP's. Rather, detailed elements of an acceptable plan were provided in § 110(a)(2) of the Act. 42 U.S.C. § 7410(a)(2).

Within four months of the date each state submitted its SIP, the EPA Administrator was required to review the plan and determine whether it complied with the statutory commands. 42 U.S.C. § 7410(a)(1). More specifically, EPA was directed either to approve the plan if it was satisfactory, or importantly, to disapprove the SIP or any portion thereof which failed to meet the legislative mandate *and* within six months of the date the plan was submitted promulgate federal regulations in lieu of the non-conforming SIP. 42 U.S.C. § 7410(c)(1); *City of Highland Park v. Train,* 519 F.2d 681, 685 (7th Cir. 1975). *See also, Mountain States Legal Foundation v. Costle,* 630 F.2d 754 (10th Cir. 1980); *District of Columbia v. Train,* 521 F.2d 971 (D.C.Cir.1975). Thus, the salient feature of the 1970 legislative plan was that, although clean air was a joint federal-state concern, the federal government would not countenance delay on the state level in carrying out the Act.

In response to the recognition that many states had failed or would fail to meet the air quality standards established by EPA, *see* Currie, "Relaxation of Implementation Plans Under the 1977 Clean Air Act Amendments", 78 *Mich.L.Rev.* 155, 184 (1978); *New England Legal Foundation v. Costle,* 475 F.Supp. 425, 428 (D.Conn.1979), Congress undertook to revise the Clean Air Act in 1977. Of the extensive revisions to the Act at that time, four are of interest here. First, Congress extended the deadline for attaining NAAQS from December 31, 1977 to December 31, 1982 (and with respect to certain pollutants, until December 31, 1987). Second, each state which had failed to meet the 1977 deadline was required, in § 107 of the Act, to identify those air quality control regions failing to reach the deadline as "non-attainment" regions. Areas not meeting the relevant air quality standard for one or more pollutants were to be designated as "non-attainment" for each pollutant for which the NAAQS was violated. 42 U.S.C. § 7501(3). These designations were to be submitted and approved by EPA after notice and comment. *United States Steel Corp. v. United States Environmental Protection Agency,* 595 F.2d 207 (5th Cir. 1979).

The 1977 revisions further contemplated that each state with non-attainment area designations approved by the Administrator would submit revised SIP's (hereinafter sometimes referred to as "Part D SIP's") either, as is discussed more fully below, on a voluntary or mandatory basis. A required element of a Part D SIP is that it must assure attainment with the NAAQS "as soon as practicable", but in any event not later than December 31, 1982. Part D revisions were to have been submitted to EPA by January 1, 1979, and were to have been effective no later than July 1, 1979. P.L. 95–95, 95th Cong., 1st Sess., Title I, § 129(c), 91 Stat. 750 (not codified in U.S.C.).

Finally, to reinforce the commitment to achieving air quality standards by the new deadlines, certain provisions were added to the Act in 1977. For example, section 172, in conjunction with section 110(a)(2)(I) of the 1977 Act, featured the imposition, upon certain conditions (which are the subject of dispute between the parties here) of "new and modified source" restrictions in air quality regions designated as non-attain-

ment. 42 U.S.C. §§ 7502, 7410(a)(2)(I). Further, if a state appeared to be unable to satisfy the 1982 deadlines it faced the possible loss of federal highway construction funds, 42 U.S.C. § 7506(a), and sewage-treatment facility funding. 42 U.S.C. § 7616(b)(2).

The judicial enforcement mechanism of the Clean Air Act is only slightly less cumbersome than the substantive provisions. In sections 304 and 307 of the Act, 42 U.S.C. §§ 7604, 7607, Congress specified a bifurcated and mutually exclusive system of judicial supervision. Section 307 of the statute permits petitions for review of the "Administrator's action in approving or promulgating any implementation plan under § 110 . . . or under regulations thereunder, or any other final action of the Administrator," including EPA disapprovals of state SIP's, *only* in the appropriate court of appeals. 42 U.S.C. § 7607(b)(2). In contrast, section 304(a)(2), the Act's "citizen suit" provision which CBE has invoked here, states in pertinent part:

> . . . [A]ny person may commence a civil action on his own behalf . . .
>
> (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator . . .
>
> The district court shall have jurisdiction without regard to the amount in controversy or the citizenship of the parties to . . . order the Administrator to perform such act or duty.

42 U.S.C. § 7604(a)(2).

## B. PROCEDURAL HISTORY

As noted above, the focus of CBE's complaint is on EPA's administrative actions subsequent to the 1977 Clean Air Act Amendments. Pursuant to the 1970 Act, both Illinois and Indiana had submitted SIP's which were duly approved by the Administrator on the basis of the applicable EPA regulations defining the terms of a conforming SIP.[3] However, both Illinois and Indiana were among those states which had failed, or were to fail, to attain NAAQS for several pollutants. Accordingly, both states designated certain regions as non-attainment areas, including the Chicago Metropolitan Air Quality Control Region—the subject of this lawsuit. On March 3, 1978 and October 8, 1978, the Administrator approved these designations for both states as non-attainment for TSP and other pollutants pursuant to § 107 of the Act. 42 U.S.C. § 7407. 43 Fed.Reg. 8962 (1978); 43 Fed.Reg. 45993 (1978).

In accordance with EPA's non-attainment designations, on April 3, 1979, three months after the statutorily mandated submittal date, the state of Illinois submitted a draft version of its Part D SIP to the Administrator. On July 2, 1979, EPA published a notice of proposed rulemaking on the draft SIP, in which it identified those portions of the plan which did not comply with the requirements of the Clean Air Act. 44 Fed.Reg. 38587 (1979). On August 29, 1979, Illinois submitted additional information to EPA for inclusion in the SIP and to clarify some of the provisions of the April 3, 1979 submission. 44 Fed.Reg. 11472, 11493 (1980). Still another supplement to the April 3 draft was received by EPA on November 14, 1979. This submission included, *inter alia*, final regulations of the Illinois Pollution Control Board for the control of TSP emissions from steel industry facilities.

On January 8, 1980, CBE filed this action in federal district court. At that time, no notice of proposed agency action had been published by the Administrator with respect to the draft SIP. In its original complaint, CBE brought three specific claims directly challenging EPA's handling of the Illinois Part D SIP and indirectly disputing the adequacy of the revised SIP itself. In

---

**3.** The memoranda submitted by the parties reveal that there is some dispute both as to what was required in a 1972 SIP under the then applicable EPA regulations, particularly with respect to monitoring and reporting requirements, *infra* at 269, and as to what the states actually submitted. The resolution of these questions is not required to dispose of the pending motion and, accordingly, is deferred to a later date.

Count I, CBE sought to compel, pursuant to § 110(c) of the Act, 42 U.S.C. § 7410(c), federal rulemaking aimed at preparing and publishing control strategies for TSP emissions for non-attainment areas with iron and steel sources of pollutants. These control strategies had been the subject of Illinois' November 14 submission to EPA.

Count II sought federal rulemaking on the basis of Illinois' alleged failure to submit to EPA rules governing the issuance of permits to construct new sources of pollution in non-attainment areas as required by § 172. 42 U.S.C. § 7502. Count III demanded immediate federal rulemaking in order to remedy the state's failure to submit an SIP complying with the monitoring and reporting requirements of § 110(a)(2)(F)(ii), (iii) and (iv) of the 1977 Act.[4] 42 U.S.C. § 7410(a)(2)(F). In its original answer, EPA admitted that Illinois' Part D SIP contained no provisions corresponding to the requirements of § 110(a)(2)(F).

Of course, EPA's administrative process has continued subsequent to the filing of CBE's complaint and EPA's actions have somewhat affected the status of this lawsuit. On February 21, 1980, EPA took some final action in this matter by approving in part, and disapproving in part, that portion of the Part D SIP which had been subject to public notice and comment. 45 Fed.Reg. 11472, *et seq.* The Administrator did not,

however, act on those portions of the SIP which had not been published as subject to proposed agency action. Those portions of the revision *not* acted upon included the state's November 14 submission for TSP control strategies which were by then the subject of Count I of CBE's complaint. On June 20, 1980, CBE filed an amended complaint to account for these administrative developments.

On July 31, 1980, EPA issued another notice, this one proposing to approve in part and disapprove in part Illinois' control strategies for TSP emissions. 45 Fed.Reg. 50825.[5] According to plaintiffs, however, this notice was unaccompanied by the customary notice of proposed federal rulemaking to promulgate the allegedly necessary substitute regulations. *See, e. g., Utah International, Inc. v. EPA*, 478 F.2d 126 (10th Cir. 1973). Administrative developments subsequent to the amended complaint have not, therefore, mooted either Count I or Count III.

■ These developments have, however, affected Count II—CBE's challenge to Illinois' new construction permit rules. On February 11, 1980, EPA approved Illinois' rules for new sources. As such, plaintiffs now concede that the exclusive jurisdiction to review EPA's determinations rests with the court of appeals. And while CBE has urged the Court to delay dismissing Count II, it has furnished no persuasive justifica-

---

**4.** Section 110(a)(2)(F) mandates SIP's to require owners and operators of stationary sources of pollutants to install equipment to monitor emissions from these sources, § 110(a)(2)(F)(ii); ,require periodic reports on the nature and amounts of such emissions, § 110(a)(2)(F)(iii); and require the state's environmental protection agency to make these monitoring reports available to the public, § 110(a)(2)(F)(iv).

**5.** The July 31, 1980 notice states as follows: The proposed rulemaking today addresses the previously omitted provisions of the Illinois submittal pertaining to particulate control for iron and steel process sources, and the control strategy in TSP non-attainment areas containing iron and steel sources and invites public comment on the specific revisions and U.S. EPA's proposed action. Today's rulemaking proposes to approve cer-

tain regulations, conditionally approve certain regulations, disapprove others, and conditionally approve the Illinois particulate strategy for non-attainment areas containing iron and steel sources.
45 Fed.Reg. 50825 (1980). The Illinois regulations which EPA proposes to disapprove include rules establishing emission limitations for significant iron and steel sources of TSP emissions including coke oven charging and pushing operations, coke plant quenching operations, and steel-making operations of the basic oxygen furnace. 45 Fed.Reg. 50827–31.
In addition, EPA proposes to disapprove Illinois' rule governing the use of test methods to determine compliance with emissions limitations. Each of the rules slated for disapproval fail, according to EPA, to comply with the "reasonably available control technology" requirements of the Act.

tion for such delay. Accordingly, the motions to dismiss are granted as to Count II of the complaint.[6]

The administrative history with respect to Indiana is no less complicated. On June 26, 1979, the state submitted to EPA portions of its proposed Part D SIP revisions. These later were supplemented on February 11, 1980. 45 Fed.Reg. 20122, 20432 (1980). As of January 8, 1980, however, when CBE filed its complaint, EPA had issued no notices of proposed rulemaking regarding Indiana's Part D SIP. In Count IV of the complaint, CBE sought federal rulemaking on the basis of Indiana's failure to include a proposal providing for the attainment of NAAQS for TSP in Lake and Porter Counties. Count V of the complaint mirrored the allegations of Count III, this time with regard to Indiana's failure to require monitoring and reporting procedures specified by § 110(a)(2)(F)(ii), (iii) and (iv) of the Act.

Count IV, like Count II, has been subject to later revision as EPA's administrative process has limped along. Specifically, CBE and the steel intervenors stipulated to summary judgment insofar as plaintiffs' claims concerned Porter County. In addition, EPA issued two notices of proposed rulemaking on the June 26, Part D SIP. On March 27, 1980, EPA proposed action on various Indiana regulations for sources other than iron and steel. The notice also stated:

> No control strategies or demonstrations were included in the submittal for the primary and secondary non-attainment areas of Marion, Lake, Lark, Vigo and LaPorte Counties. Regulations to implement the strategies have similarly not been adopted by the State or submitted to U.S. EPA.

45 Fed.Reg. 20435 (1980).

The second notice, on July 3, 1980, addressed those regulations applicable to iron and steel sources of TSP emissions. The notice essentially admitted that no satisfactory Part D SIP has yet been submitted for iron and steel sources and further stated that the Indiana regulations were to be disapproved for failing to satisfy the "reasonably available control technology" ("RACT") requirements of § 172(b)(3). 42 U.S.C. § 7502(b)(3). 45 Fed.Reg. 45314 (1980). Again, however, as with Illinois, EPA's notice of proposed disapproval was not accompanied by the traditional notice of proposed federal rulemaking to promulgate the substitute regulations sought by CBE here.

## DISCUSSION

### 1. Motion to Dismiss for Lack of Jurisdiction.

■ Perhaps the most striking feature of this litigation is the extent to which EPA's administrative processing of Illinois' and Indiana's Part D SIP's has diverged from the procedure contemplated by the Clean Air Act. And it is because of this divergence that this Court has jurisdiction over the claims raised here. All of the parties have focused on EPA's responsibility to promulgate federal regulations as the non-discretionary function upon which the Court's jurisdiction may be premised as if that were the only possible non-discretionary duty created by the Act. But there are others. In demanding the relief sought by the complaint plaintiffs have, in metaphorical terms, sought to run rather than walk. The terrain created by the detailed provisions of the Clean Air Act may demand a slower pace. Alternatively, the defendants and intervenors contend that CBE is seeking to proceed too rapidly, but their position is that everyone should stand still until EPA decides to act. Stated succinctly, this court concludes that it is at least arguable that EPA has a current non-discretionary duty to promulgate federal regulations in some

---

6. CBE acknowledges that the review of EPA's determination is vested in the Court of Appeals but urges delay in dismissing Count II because it might be necessary in the future to compel EPA to act in accordance with the Seventh Circuit's decision. Not only is it highly questionable that such delay is proper in light of the jurisdictional plan of the Clean Air Act, but even if it is, this court is most reluctant to assume the role of a continual overseer of any EPA actions with regard to the Indiana and Illinois SIP's.

of the settings raised by the complaint, and jurisdiction attaches to determine those claims. In addition, it is beyond dispute that EPA has a mandatory duty to determine in the first instance whether the states' plans comply with the Act. Since EPA has failed to perform this duty, jurisdiction exists in this court to compel its performance.

As noted previously, § 129(c) anticipated that the states would submit their Part D SIP's by January 1, 1979. Congress expected these submissions to be in effect by July 1, 1979. The congressional plan, however, was frustrated from the outset; neither Illinois nor Indiana submitted their plans on time. The states' tardiness was followed by, in substantial respects, continuing inaction by EPA. The Clean Air Act provides, in § 110(c):

> (c)(1) The Administrator shall, after consideration of any State hearing record, promptly prepare and publish proposed regulations setting forth an implementation plan, or portion thereof, for a State if—
>
> > (A) the State fails to submit an implementation plan which meets the requirements of this section,
> >
> > (B) the plan, or any portion thereof, submitted for such State is determined by the Administrator not to be in accordance with the requirements of this section
>
> \*   \*   \*   \*   \*   \*
>
> If such State held no public hearing associated with respect to such plan (or revision thereof), the Administrator shall provide opportunity for such hearing within such State on any proposed regulation. The Administrator shall, within six months after the date required for submission of such plan (or revision thereof), promulgate any such regulations unless, prior to such promulgation, such State has adopted and submitted a plan (or revision) which the Administrator deter-

mines to be in accordance with the requirements of this section. . . .

Instead of approving or disapproving the various portions of the Indiana and Illinois plans as prescribed by § 110(c), EPA has proceeded as if it were reviewing the patentability of patent claims. With respect to both the Indiana and Illinois Part D SIP's EPA has approved, conditionally approved, disapproved, conditionally disapproved and even deferred action on various portions of submissions. The result has been approval of certain portions and disapproval of others, with rulemaking following, as provided by the statute. The result has been agency inaction with respect to other portions, and it is this inaction of which CBE complains.[7]

A review of the precedent reveals that the existence of a non-discretionary duty to determine timely whether the states' SIP's comply with the Act has been viewed as almost axiomatic. The pre-1977 precedent is unanimous on this score. In *Kennecott Copper Corp. v. Costle*, 572 F.2d 1349, 1354 (9th Cir. 1978), the court stated:

> It is clear that the Administrator has a non-discretionary duty to make a decision regarding the state revision.

The Seventh Circuit took a similar view in *City of Highland Park v. Train*, 519 F.2d 681 (7th Cir. 1975) when it construed the 1970 Clean Air Act as requiring a determination of the adequacy of the plan within *four months of its submission and federal rulemaking within six months of its submission.* 519 F.2d at 685. *See also, District of Columbia v. Train*, 521 F.2d 971 (D.C.Cir. 1975); *National Resources Defense Council v. Environmental Protection Agency*, 478 F.2d 875, 888 (1st Cir. 1973).

The 1977 Clean Air Act Amendments made only minor changes in EPA's duty. While the four month deadline noted by the Seventh Circuit may no longer apply since Part D SIP's are submitted under § 110(a)(2)(I) instead of § 110(a)(1) (which specifies the four month deadline), the crit-

---

7. This is not to say that EPA's procedure necessarily is wholly unreasonable in light of the potentially enormous task delegated by Congress to the agency in the Clean Air Act. On the record before the court now, however, EPA has offered no explanation or justification for departing from the procedure outlined in the statute, perhaps because none is available.

ical language of § 110(c) remains. That is, EPA's duty to promulgate federal regulations within six months of submission is still extant. Common sense dictates, therefore, that the Administrator has a duty to determine the adequacy of the plan before then.[8]

Other courts have agreed. For example, in *New England Legal Foundation v. Costle*, 475 F.Supp. 425 (D.Conn.1979), then District Judge Newman commented on the procedures mandated by the newly revised Clean Air Act and concluded that EPA had a mandatory duty to determine whether the SIP's in dispute in that case were adequate to achieve the air quality standards posited for Connecticut. *New England Legal Foundation v. Costle*, 425 F.Supp. at 432. (*But see, Mountain States Legal Foundation v. Costle*, 630 F.2d 754, 757 (10th Cir. 1980), where the court noted an EPA procedure similar to the one used here and did not comment on its adequacy.) Accordingly, the court concludes that EPA clearly had a mandatory duty to determine finally whether Illinois and Indiana's SIP's were adequate under the Clean Air Act. Since that duty has not been performed, plaintiffs are entitled to request this court to compel performance. On that ground alone the motions to dismiss must be denied.[9]

This observation alone, however, does not dispose of the issues before the court since, as already noted, plaintiffs seek immediate rulemaking on the basis of § 110(c)(1)(A) or (c)(1)(B). The court agrees with the private intervenors that a non-discretionary duty cannot arise out of § 110(c)(1)(A) under the circumstances presented here. Subsection (c)(1)(A) provides for federal rulemaking in the event a state fails to submit a "plan which meets the requirements of this section." In the court's opinion, subsection (c)(1)(A) triggers the Administrator's rule-

making duties only when the state fails to submit any plan at all. Plaintiffs do not contend that either Illinois or Indiana has failed to file a Part D SIP, but rather that certain required portions of the plan are missing. This allegation alone is insufficient to trigger any duty under subsection (c)(1)(A).

The language of the statute compels this result. In contrast to the other provisions of § 110(c)(1), which refer to "plans" or "any portions thereof", subsection (c)(1)(A) only refers to "plans". In so drafting the statute Congress sharply distinguished the failure to submit a plan in toto from the submission of a partially inadequate plan. The legislative history cited by CBE is insufficient to overcome the language of the statute here. *Gemsco v. Walling*, 324 U.S. 244, 260, 65 S.Ct. 605, 614–615, 89 L.Ed. 921 (1945).

Moreover, the distinction drawn by the statute is meaningful. As the facts of this case make clear, the difference between a determination by the Administrator that certain provisions of an SIP were not submitted and a determination that the plan is in certain respects inadequate often is illusory. Such determinations may well call for an interpretation of a submission which, in turn, calls for the exercise of experienced judgment by the Administrator, the hallmark of a discretionary decision. *Kennecott Copper Corp. v. Costle, supra* at 1354. Given the overlap between these types of determinations, their review is better left to the Court of Appeals except in those cases in which there can be no doubt—*i. e.*, where the state has submitted no plan at all.

The court, however, concludes that jurisdiction to compel the performance of a non-

---

**8.** That those determinations must be promptly made is underscored by the requirement that the Administrator shall, "after consideration of any State hearing record, promptly . . ." go ahead with rulemaking if a plan has not been submitted or is inadequate, in order to promulgate the regulations within six months of the required submission date. While this court believes the initial non-discretionary duty to be the determination, the practical effect should

be substantially similar to the effect of the CBE contention this court rejects, *infra* at 272, since rulemaking should promptly follow an adverse determination.

**9.** The analysis set forth above obviously is also relevant to EPA's motion to dismiss Counts XXII and XXIII of the Steel intervenor's complaint, *infra* at 277–278. Accordingly, EPA's motion to dismiss these counts is denied.

discretionary duty may arise under § 110(c)(1)(B) of the Clean Air Act with respect to certain of the claims advanced. As noted above, that section demands federal rulemaking within six months of the submission of an SIP if the Administrator determines that "the plan, or any portions thereof, . . . [is not] in accordance with the requirements of this section." 42 U.S.C. § 7410(c)(1)(B).

Defendant and intervenors first argue that the duty to promulgate federal rules arises only once the Administrator has determined that the SIP's "fail to meet the requirements of 'this section'". This court agrees. And when the facts of this case and the legislative purpose of the Clean Air Act are considered in the context of the administrative delay here, the conclusion inures that the Administrator already may have made sufficiently definitive determinations to trigger a present duty to proceed toward federal rulemaking.

The intervenors also offer an additional argument. They contend that, according to the 1977 Amendments to the Clean Air Act, absent a determination that Illinois' and Indiana's original SIP's were inadequate the only consequence of the state's failure to submit adequate Part D SIP revisions is not the initiation of federal rulemaking, but rather the automatic imposition of a ban on new and modified sources of pollutants in the non-attainment regions.[10] Although the claim raised by the intervenors is not insubstantial, the court concludes that the sanctions attendant to the failure to submit adequate Part D revisions are not so circumscribed.

Turning first to the arguments advanced by EPA, they are unjustified in view of the facts of this case and certainly contrary to the spirit of the legislation. With respect to both the Indiana and Illinois SIP revisions, it is not at all clear that the Administrator has failed to make a § 110(c)(1)(B) determination that the plans are not in compliance. As reviewed above, the Administrator, on July 31, 1980 issued a notice of proposed disapproval of Illinois control strategies for TSP omissions. On March 27, 1980 and again on July 3, 1980, EPA issued notices of proposed disapproval of Indiana's Part D SIP on the grounds that "no control strategies or demonstrations were included in the submittal for non-attainment areas" including Lake County, Indiana.

Therefore, with regard to Counts I and IV, CBE may argue, with some force, that EPA has, *in fact*, already determined that the Part D revisions are inadequate. Had EPA followed its normal procedures, these proposed notices would have been accompanied by notices of proposed federal rulemaking and CBE would have obtained the relief it seeks here. *Utah International v. EPA, supra.* The fact that EPA has failed, in this instance, to follow its normal administrative process is hardly grounds to deny plaintiffs the relief they seek here.

Indeed, given the fact that EPA already has identified the non-conforming provisions of the states' respective SIP's, its argument necessarily raises form over substance. In essence EPA relies on the fact that only the formality of declaring the plan "disapproved" in final form is absent here. The Administrator's position is troubling in light of the procedures he has employed. If the Administrator had disapproved the control strategies, then presumably the government would concede that federal rulemaking is in order and that the court could compel this process under § 110(c)(1)(B). If the Administrator had approved the control strategy, the plaintiffs could challenge his determination in the

---

10. Actually, not only do the intervenors dispute EPA's position on this point, they also disagree among themselves. The private intervenors have urged the position set forth above. The steel intervenors' claim is even more extreme. Not only do they claim that the failure to submit a Part D SIP alone does not warrant federal rulemaking, they also suggest that the imposition of a new and modified source ban is not automatic under the 1977 Amendments. Rather, the steel companies argue that additional EPA procedures are a prerequisite to the ban. As is discussed more fully below, this suggested interpretation is contrary not only to the statute itself, but also to its intent and the administrative background of the new source ban.

court of appeals. But now, by taking no final action at all, the Administrator seeks to place CBE in an administrative purgatory. It has no current remedy in federal court even though the initial deadline for EPA rulemaking has come and gone and the revised deadline for attainment under the 1977 Amendments approaches. Clearly, the result attendant to accepting EPA's argument was not contemplated by the drafters of the Clean Air Act, nor is it consistent with the language of § 110(c) itself.

Finally, little rational basis exists for failing to regard the Administrator as having already determined that the plans are inadequate. Presumably, any discretionary judgments and any evaluations of the plans calling for administrative expertise have already been made in conjunction with EPA's notice of proposed disapproval. As such, intervention by a federal district court at this point would not cause the mischief that the judicial review provisions of the Clean Air Act sought to avoid. That is, this court's action would not preempt, substitute or overrule any discretionary determinations by an agency with greater expertise than the court. Rather, our intervention is more in the nature of procedural prodding.

In addition, even if it cannot be concluded that EPA already has determined, *in fact*, that the plans are inadequate, jurisdiction to order federal rulemaking exists because EPA's delay in making such a determination may be tantamount to a negative decision. When administrative agencies have so delayed their actions so as to occasion irreparable harm to plaintiffs, federal courts have provided relief even when review of administrative action is exclusively vested in a court of appeals. *See Abbott Laboratories v. Harris*, 481 F.Supp. 74 (N.D. Ill.1979), and cases cited therein: L. Jaffee, *Judicial Control of Administrative Action*, (1965).

In the instant situation, the citizens suit provisions of the Clean Air Act anticipate judicial intervention in the nature of mandamus. As this court noted in *Abbott Laboratories*, "relief has been granted by mandamus, by equating inaction with finality or on the basis of the statute which is the source of agency authority." *Abbott Laboratories v. Harris, supra* at 77, *citing, North American Van Lines, Inc. v. Interstate Commerce Commission*, 386 F.Supp. 665 (N.D.Ind.1974); *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093 (D.C. Cir.1970); *Blankenship v. Secretary of Health, Education & Welfare*, 587 F.2d 329 (6th Cir. 1978). This course is particularly suited here in view of the factors set forth above, when it is claimed that EPA has unduly delayed in making final determinations on all of the claims raised by plaintiffs. Accordingly, on this basis, this court has jurisdiction to order federal rulemaking for the claims advanced in Counts III and V as well as Counts I and IV.

The intervenors arguments are more plausible than those of EPA. Essentially, the intervenors have seized upon inconsistent and vague language both in the legislative history and the statute to support the conclusion that there is no duty to promulgate federal rules in lieu of an inadequate *Part D* SIP. The initial appeal of the intervenors' position is its recognition, as noted above, that the 1977 Amendments reflected a different approach toward achieving clean air than that adopted in 1970. The 1970 Act had been severely criticized as both unrealistic and unworkable. The attempt to drag private sources of pollutants and reluctant states into compliance had not proved fruitful. In introducing the Conference Committee Bill to the Senate, Senator Muskie recognized the need for a new approach:

> So, we begin again. This time with a more specified law; this time with a greater burden on localities; this time with more tools and more flexibility. But still with a very basic objective—the objective of protecting the health and welfare of the people of this land.

A Legislative History of the Clean Air Act Amendments of 1977, Committee on Environment and Public Works, U.S. Senate, 95th Cong. 2d Sess. (1978) 342 (hereinafter *Legislative History*).

Additional statements in the Congressional debates may also be cited in support of the construction urged by the intervenors. In the introduction of the conference committee bill to both the House and Senate, statements were made suggesting that if states submit Part D revisions, they did so voluntarily. For example, Congressman Waxman of California stated:

We have struck a proper balance between environmental controls and economic growth in the dirty air areas of America. Many of our cities suffer from unhealthy levels of air pollution. Without some flexibility and direction from the Congress any further growth which adds to this pollution would be prohibited. There is no other single issue which more clearly poses the conflict between pollution control and new jobs. We have determined that neither need be compromised. The current imminent deadlines for air quality improvement will be extended for 10 years. *Communities are given an option to secure offsets for pollution from new sources, or comprehensively revising their plans to assure attainment ... by the late 1980's.*

Legislative History at 336 (emphasis added).

Senator Muskie spoke similarly in introducing the bill to the Senate:

This law will use as the basic regulatory mechanism the one logical tool which is available for protecting the environment. *This law will establish environmental protection—achievement of public health related air quality standards as a price for new economic activity.* A community which chooses to languish in its current economic situation will need to make few of the really tough decisions on matters such as land use and indirect source controls. The power of the Federal Government to force these kinds of judgments has been seriously restricted. But a community which is anxious to attract new capital and relies on heavy economic activity will have to show that it has a plan to achieve health standards by specific dates and at each point that major new economic activity become attractive that plan will have to be checked and the time

schedule reviewed to assure that a community is fulfilling its commitment.

Legislative History at 342–343 (emphasis added).

On the other hand, neither the statute nor the legislative history supports the argument raised by the intervenors that the federal rulemaking provisions are inapplicable to Part D revisions or applicable only after EPA determines that the original 1970 SIP is not adequate to ensure attainment by the 1977 deadlines. For example, in drafting § 172(b)(1) Congress chose language which clearly contemplates that some portions of a Part D SIP may be achieved by federal rulemaking. This subsection provides, in pertinent part:

(b) The [Part D] provisions required by subsection (a) of this section shall—

(1) be adopted by the State (*or promulgated by the Administrator under section § 7410(c) of this title*) after reasonable notice and public hearings; ...

42 U.S.C. § 7502(b)(1) (emphasis added).

The Conference Committee report also suggests that the mandatory rulemaking provisions of § 110(c) may be applicable to Part D revisions. In describing the committee's compromise bill, the report states:

As a condition for permitting major new sources to locate in a nonattainment area, States are required to have *approved* revised implementation plans.

Legislative History at 537 (emphasis added). The suggestion that the plans be "approved" seems to imply that EPA, at some point, would be required to evaluate the adequacy of the SIP revisions and concomitantly, promulgate federal rules pursuant to § 110(c) if the SIP's were inadequate.

Reconciling the statutory language and the conflicting legislative history is, at best, problematic. However, when viewed in total, what these statements suggest to the court is not that EPA's rulemaking power simply is inapplicable to Part D revisions, or, as intervenors suggest, that EPA must determine that the old SIP is inadequate to assure attainment by 1982, but rather that EPA's initial power to demand a Part D SIP is somewhat circumscribed.

Specifically, in § 129(c) of the 1977 Act, Congress required states to submit Part D SIP's which met the standards of § 110(a)(2)(I) of the Act.[11] § 110(a)(2)(I) set forth alternative requirements. At a minimum, a Part D SIP must have provided for a new and modified source ban.[12] Alternatively, under the subsection, states could choose to go further and avoid the ban by submitting Part D SIP's containing the additional elements provided by § 172.[13]

When viewed in this light, the statements of Rep. Waxman and Sen. Muskie can be squared with the statutory scheme. As Professor Currie suggests, the revised 1966 Act contemplates a partial "blackmail" scheme. Currie, *1977 Clean Air Act Amendments* at 187. The states may choose dirty air and a new source ban by submitting (or having EPA promulgate for them) only the "bare bones" required under § 110(a)(2)(I). If the states elect this option, EPA's duty to promulgate federal rules never arises. However, neither Illinois nor Indiana have opted for this course. Rather they have chosen to file Part D SIP's in accordance with § 172. And once they have, EPA's duty to make federal rules commences in accordance with the procedures set forth in § 110(c)(1). And, as discussed above, this is a duty which can be compelled under § 304(a)(2).

An examination of the chronological context of the 1977 Amendments confirms this construction. The provisions of Part D of the 1977 Act were essentially continuations of EPA's "offset" policy adopted under the 1970 Act to prevent undue hardship in areas which had failed to meet the 1970 NAAQS deadlines.[14] Had the intractible deadlines and requirements of the 1970 Act been strictly enforced, existing sources of pollution in highly developed and highly polluted regions would have been forced to shut down. Concurrently, new sources would have been absolutely banned since they would contribute to the continuing violations of the NAAQS. EPA's offset policy permitted, among other things, the construction of new sources in non-complying air quality regions providing that the region's existing emissions were being reduced at a sufficient rate to produce a "positive net air-quality benefit in the exiting areas." *See* Currie, *1977 Clean Air Act Amendments* at 185.

The lineage of the Part D revisions thus suggests that they were designed as a flexible approach to relieve temporarily the burdens imposed by the 1970 Act on non-attainment areas and owners of new sources of pollutants. The construction adopted above is consistent with this background. The interpretation offered by intervenors is not. To illustrate, if one considers the interests of the state under the Part D Amendments, in this instance both Illinois and Indiana have decided against accepting the costs attendant to a new source ban.

**11.** In fact § 129(c) appears to flatly contradict the Congressional debates (as well as the language of § 110(a)(2)(I) quoted below. Read literally, § 129(c) seems to absolutely require the submission of Part D SIP's for any non-attainment areas. That section provides:

Notwithstanding the requirements of section 406(d)(2) ... for purposes of section § 110(a)(2) of the Clean Air Act each state *shall* adopt and submit an implementation plan revision which meets the requirements of § 110(a)(2)(I) *and Part D* of Title I of the Clean Air Act not later than January 1, 1979 (emphasis added).

**12.** Presumably, if the states failed to submit anything at all, EPA would promulgate a new source ban pursuant to § 110(c).

**13.** § 110(a)(2)(I) specifies that an acceptable SIP must provide:

... that after June 30, 1979, no major stationary source be constructed or modified in any nonattainment area ... to which such plan applies, if the emissions from such facility will cause or contribute to concentrations of any pollutant for which a national ambient air quality standard is exceeded in such area, unless, as of the time of application for a permit for such construction or modification, such plan meets the requirements of part D of this subchapter (relating to nonattainment areas);

**14.** Professor Currie comments:

The offset policy and the EPA's legislative proposal were the raw materials from which the Conference Committee produced Part D of the 1977 Amendments.

Currie, *1977 Clean Air Act Amendments* at 185.

The price of avoiding the ban is having an approved Part D SIP in effect. 42 U.S.C. § 7410(a)(2)(I). Thus Illinois and Indiana, having made their initial efforts at a complying plan, have an interest in prompt EPA rulemaking in order to complete the requirements of § 110(a)(2)(I). Owners of new sources of pollution, eager to obtain permit exemptions, are in a similar position. Indeed, the only entities whose interests might not be served by prompt EPA rulemaking are the owners of those existing sources of pollutants who have created the initial non-attainment problem. Absent an approved Part D plan, no new or modified sources of emissions may be constructed leaving the existing sources with a lid on competition in the air quality region.[15] When viewed in this light, it is perhaps not surprising that the steel intervenors have proposed their construction of the statute. Yet this is neither consistent with the general goal of cleaning the air nor with the purpose of Part D—to alleviate undue economic hardship while the underlying goals are being achieved.

■ In summary, the intervenors are correct in suggesting that EPA may not compel the submission of a full-scale Part D SIP. To the extent that Illinois and Indiana have submitted Part D revisions, they have done so voluntarily. The states' decisions to submit these plans implicitly rejects the alternative of accepting a new source ban. Once these plans have been submitted, the states and the public are entitled to prompt EPA rulemaking to remedy any non-conforming provisions of the states' submissions. And, as discussed above, the duty to promulgate promptly federal rules is not discretionary under § 110(c)(1) and may be enforced pursuant to a "citizens suit" in district court. Accordingly the motions to dismiss are denied.

## 2. Indiana Legal Foundation's Motion to Dismiss For Improper Venue.

Intervenor Indiana Legal Foundation ("ILF") has also moved to dismiss this action on the grounds of improper venue. ILF cites 42 U.S.C. § 7604(c)(1) of the Clean Air Act in support of its position. That section provides:

Any action respecting a violation by a stationary source of an emission standard or limitation or an order respecting such standard or limitation may be brought only in the judicial district in which such source is located.

■ Section 7604(c)(1) is inapplicable on its face to the current complaint. Even assuming that intervenors can raise the venue objection after it has been waived by the defendants, subsection (c)(1) is obviously the corollary venue provision for citizen suits under § 7604(a)(1) which allows private plaintiffs to sue individual violators of emissions standards. Plaintiffs' action is against EPA for failure to perform a mandatory duty, not against any individual stationary source of pollutants. The action is brought under § 7604(a)(2) and is an action in the nature of mandamus governed by the provisions of 28 U.S.C. § 1391(e). Accordingly, ILF's venue objection is not well-taken and the motion is denied.

## 3. EPA's Motion to Dismiss the Intervenors' Claims.

In contrast to CBE's claims that EPA has not done enough, the essence of the Steel intervenors' pleading is that the agency has done more than it is authorized to do. The intervenors raise four specific claims contested here. In Count XXIV, Steel alleges, in the alternative, that EPA has no authority to impose national RACT standards upon the individual states, or that, to the extent such authority exists, EPA has unlawfully imposed the RACT limitations by promulgating them without the required notice and comment specified by § 307(d) of the Clean Air Act, 42 U.S.C. § 7607(d) and the Administrative Procedure Act, 5 U.S.C. § 551 et seq. Count XXV questions the legality of the new source ban described previously, or, more pointedly, EPA's authority to issue the ban in the form of an

---

**15.** However, as evidenced by Counts XXII and XXIII of the Steel intervenor's pleadings, even they do not view the interminable delays in approving the SIP's as in their own interests.

"interpretive rule", instead of providing for rulemaking with notice and comment.

Counts XXVI and XXVII are, to some degree, interrelated. The former is styled as a broad based attack on the legality of EPA's "applicability" criteria for SIP revisions, i. e., those informal guidelines issued by EPA for the state's consideration when it formulates Part D revisions. In the intervenors' view, the "guidelines" are really preemptory attempts by EPA to coerce the states into formulating SIP's in conformance with EPA's own standards. Presumably, what EPA must do, in Steel's view, is wait until the state submits its revision, and then approve or disapprove the plans on the basis of these criteria. In particular, Count XXVI challenges, *inter alia*, EPA's "conditional approval" mechanism, and the "stringency", "enforceability", "relaxation or revocation" and "continuity" guidelines. Count XXVII also relates to EPA's "conditional approval" mechanism, this time *as applied* to the Illinois SIP. The steel intervenors contend that the conditional approval must be deemed a notice of deficiency as defined in § 110(c)(1)(C) of the Act, which can only be issued after notice and comment.

Most of the claims raised by the intervenors are not amenable to resolution in a district court. They are dismissed, therefore, for the reasons set forth herein.

a. *Counts XXIV and XXVI are not ripe for review.*

■ It is without doubt that the availability of judicial review of administrative actions is affected by the timing of the claims. This concern has been expressed by the courts by requiring a claim to be "ripe" for consideration. Determining whether a claim is ripe involves the evaluation of two factors: (1) the fitness of the issues for judicial resolution and (2) the character and severity of any hardship which may result from the withholding of judicial consideration. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–149, 87 S.Ct. 1507, 1515–1516, 18 L.Ed.2d 681 (1967). Relevant to this inquiry is whether judicial determination of

the issue "is likely to stand on a much surer footing in the context of a [subsequent] specific application of the regulation." *Toilet Goods Association v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967). "Issues are considered 'fit' for judicial resolution when they can be characterized as 'purely legal' and as 'concrete' and when they are posed by final agency action." *Rubber Manufacturers v. Costle*, No. 79–189, slip opinion (D.Del., March 27, 1980) (slip op. at 14).

Neither Count XXIV nor Count XXVI alleges that the Administrator has taken any final action with respect to the Indiana or Illinois SIP's. Rather, intervenors claim that the issue is ripe for consideration because EPA is attempting to coerce the states into incorporating RACT limitations and other provisions that EPA preliminarily considers advisable for inclusion into Part D revisions. Significantly, the intervenors do not even allege that the states have actually succumbed to this coercion, only that they might in the future.

■ In the court's view these allegations fail to raise a currently cognizable claim. And, the facts available here confirm that the claim is not ripe. The RACT limitations are informal suggestions of what EPA considers the state of the art in environmental control technology. The RACT guidelines are not binding upon the states. The "approvability criteria" perform much the same function. These guidelines were published as part of a "General *Preamble* for Proposed Rulemaking." They are not expressed in mandatory terms. They are not even binding on EPA, no less on the state agencies. Although the guidelines may be consulted by the states (as well as this court) to gain a better understanding of the Administrator's views in approving SIP revisions, they do not establish legally enforceable requirements. Intervenors' fear that the criteria may some day be binding or some day accepted by the state environmental agencies does not pose the issue in concrete form or render it otherwise fit for review.

Faced with virtually identical claims, the District Court for the District of Delaware

has reached the same result. In *Rubber Manufacturers Association v. Castle, supra,* plaintiffs sought declaratory and injunctive relief against EPA challenging the agency's issuance and proposed utilization of a "Control Technique Guideline" ("CTG"). The CTG was issued by the Administrator for the same purposes as the guidelines at issue here—to give guidance to the states in formulating plans and to EPA in evaluating those proposals. As in the instant case, plaintiffs contended that the adoption of the CTG served to coerce the states into accepting EPA's determination of RACT, effectively denying plaintiffs their right to participate in the rulemaking process and precluding effective judicial review.

*Rubber Manufacturers* is directly on point. The court's conclusions apply with full force here:

> [J]udicial consideration of plaintiffs' arguments is premature. The adequacy or inadequacy of the EPA performance in disseminating control technique information can have no direct and immediate impact upon plaintiffs until after a State's SIP has been developed and approved. Moreover, only at that point will a concrete issue be posed, though one somewhat different from those which plaintiffs now seek to litigate. A regulated party has no right to judicially test the accuracy and basis of all information entering the administrative process. The States will not only be considering the EPA supplied information but also information supplied by plaintiffs and others. A State may or may not rely upon EPA supplied data, but, whatever its ultimate decision, the issue for judicial review will be whether that decision is supported by the record as a whole and not whether the EPA supplied data was a sufficient basis by itself for fashioning a control strategy.

*Rubber Manufacturers Association v. Castle, supra,* slip op. at 18.

Not only are the issues raised by intervenors, with one exception, not fit for current judicial consideration, but Steel also is unable to demonstrate any undue hardship from the court's declining to hear the claims. To the extent that EPA succeeds in "coercing" Illinois or Indiana into adopting the guidelines as part of their SIP's, the opportunity to challenge these guidelines will be available in the court of appeals once the SIP's are approved. Additional review in the state courts also is a possibility. *West Penn Power Co. v. Train,* 522 F.2d 302 (3rd Cir. 1975). Finally, this court is unpersuaded by the intervenors' reference to the allegedly unfair *ex parte* contacts between EPA and the state agencies. Not only are these facts not alleged in the complaint (and thus not considered here), but there is no indication that steel has not been afforded ample opportunity to submit their own positions to the state pollution control boards.[16]

Accordingly, Count XXIV is dismissed in its entirety. Count XXVI also is dismissed except with respect to the allegations that EPA's conditional approval mechanism is unlawful. As discussed previously, there is serious doubt as to whether this procedure is contemplated by the Clean Air Act. Additionally, EPA already has employed this mechanism by conditionally approving parts of both Illinois' and Indiana's Part D plans, making Intervenors' challenge sufficiently concrete to be raised at this time under § 304(a)(2).

> b. *The Court Lacks Subject Matter Jurisdiction over Counts XXV and XXVII.*

■■■ Counts XXV and XXVII suffer from an infirmity opposite from the claims dismissed above. That is, EPA's actions are sufficiently final so as to preclude review in this forum. As described above, the Clean Air Act established a bifurcated framework for judicial intervention. Review of final agency action is exclusively vested in the court of appeals. *Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980). EPA's interpretive rule

---

**16.** To the extent that EPA's informal suggestions to the states so taint the procedural fairness of the process employed to design the SIP's so as to violate the procedural requirements of the Act, this would also be a basis, available to the intervenors, for challenging the propriety of EPA's approval of the plans in the court of appeals.

concerning new source restrictions, whether lawful or not, is a final interpretation of the Act by the Administrator. On this score there is nothing left to be done by the agency. Certainly, the new source ban is no less final than the agency's determination that a certain source was subject to new source performance standards, which was considered "final" by the Supreme Court in *Harrison, supra.* Accordingly, Count XXV is dismissed.[17]

Count XXVII also must be dismissed. If this claim is considered a challenge to the procedures employed by the Administrator, these allegations merely duplicate those of Count XXVI. As the latter may be maintained, Count XXVII is not needed. However, to the extent that the cause of action asserted in Count XXVII differs from that raised in Count XXVI, it questions the merits of EPA's determination, a discretionary decision subject to review only in the court of appeals. In either event, the claim should not proceed in this court.[18]

---

17. Since the court concludes that the interpretive rule is a final agency action subject to review in the court of appeals, consideration of the question of whether the new source ban is a nationally applicable standard amenable to a hearing only in the Court of Appeals for the District of Columbia under 42 U.S.C. § 7607(b)(1) is pretermitted.

18. The court notes, however, that if the conditional approval mechanism employed by EPA is, in fact, found unlawful, the Administrator's prior conditional approval of the Illinois SIP would necessarily be without any substantive effect.