The CONNECTICUT FUND FOR THE
ENVIRONMENT, INC., et al.,
Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY, et al., Respondents,

National Retail Merchants Association,
et al., Intervenors.

No. 52, Docket 81-4025.

United States Court of Appeals,
Second Circuit.

Argued Sept. 23, 1981.

Decided Feb. 1, 1982.

Daniel Millstone, New Haven, Conn., for petitioners The Connecticut Fund for the Environment, Inc. and John Walton.

Anthony F. Pagano, Manchester, Conn., for petitioners Manchester Environmental Coalition and Michael Dworkin.

Diane L. Donley, Dept. of Justice, Washington, D. C. (Carol E. Dinkins, Asst. Atty. Gen., Dept. of Justice, Jose R. Allen, Barbara Brandon, Dept. of Justice, Lydia Wegman, Christina Kaneen, USEPA, Michael Corash, General Counsel, USEPA, Washington, D. C., Jeffrey Fowley, USEPA, Boston, Mass., on the brief), for respondents.

Nancy L. Buc, Washington, D. C. (Bruce H. Turnbull, Weil Gotshal & Manges, James Sharp and Richard S. Ewing, Washington, D. C., on the brief), for intervenors Nat. Retail Merchants Ass'n, Nat. Realty Committee, and Intern. Council of Shopping Centers.

Kenneth N. Tedford, Asst. Atty. Gen., Hartford, Conn. (Carl R. Ajello, Atty. Gen., Robert A. Whitehead, Jr., Asst. Atty. Gen., Hartford, Conn., on the brief), for intervenor State of Conn.

Before NEWMAN and KEARSE, Circuit Judges, and DALY,* District Judge.

NEWMAN, Circuit Judge:

This appeal presents questions of statutory construction regarding Congress' most recent effort to attain nationwide air quality standards—the 1977 Amendments to the Clean Air Act. Petitioners seek review of a final order of the Environmental Protection Agency (EPA) (1) conditionally approving the State of Connecticut's anti-pollution plan as in compliance with the 1977 Amendments' special provisions for states with excessive pollution levels, and (2) approving the partial withdrawal of Connecticut's program for preconstruction review of indirect sources of pollution. We uphold in large part EPA's conditional approval policy as a reasonable method of administering a complicated statute that requires a sensitive coordination of federal and state responsibilities. We find, however, that EPA's use of the conditional approval mechanism in this case departs in one respect from the elaborate statutory scheme specified by Congress in the 1977 Amendments. This concerns lifting the moratorium on new construction of major sources of pollution. Because we cannot approve this departure from the scheme Congress chose for bringing to an end the long-stalled journey toward the attainment of clean air, we grant review of the conditional approval in part; we deny review of EPA's approval of the partial withdrawal of Connecticut's indirect source review program.

I. Statutory Background

Prior to 1970, the fight against pollution was waged primarily by state and local governments with only a minimal federal supervisory role. Dissatisfaction mounted with the slow pace of these early efforts at freeing the nation's air from excessive levels of pollutants. Congress responded by enacting the Clean Air Act Amendments of 1970, Pub.L.No.91–604, 84 Stat. 1676 (codified at 42 U.S.C. §§ 1857–1858a (1970)).[1] The EPA was charged with administering a combined federal-state program to control air pollution. The heart of the program was EPA's promulgation of national primary ambient air quality standards (NAAQSs) as pollution level limits necessary "to protect the public health." 42 U.S.C. § 7409(b)(1) (Supp. III 1979).[2] Each state was to submit a state implementation plan (SIP) designed to attain these standards within three years of the SIP's approval. The 1970 Amendments provided some guidance regarding the expected content of the SIPs and EPA specified further detail. If a state failed to submit a plan that EPA could approve as meeting the statutory requirements, EPA was required to promulgate an implementation plan designed to ensure the state's attainment of the NAAQSs by the deadline. § 7410(c)(1). With provisions for extensions of the three-year deadlines for up to two years carefully circumscribed, 42 U.S.C. § 1857c–5(e)

---

* The Honorable T. F. Gilroy Daly of the United States District Court for the District of Connecticut, sitting by designation.

1. The Clean Air Act has since been recodified at 42 U.S.C. §§ 7401–7642 (Supp. III 1979).

2. References to provisions of the Clean Air Act will henceforth be made only to the appropriate section number of 42 U.S.C. (Supp. III 1979).

(1970), substantial attainment of the NAAQSs was envisioned by mid-1975, but in no event later than mid-1977. *See generally Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 63–67, 95 S.Ct. 1470, 1474–76, 43 L.Ed.2d 731 (1975); *Union Electric Co. v. EPA,* 427 U.S. 246, 249–51, 96 S.Ct. 2518, 2522–23, 49 L.Ed.2d 474 (1976).

When it became apparent that many states would fail to meet the NAAQSs by even mid-1977 because of inadequate state regulation and industry violations, Congress rescued these states from a possible shutdown of existing sources of pollution and a ban on new sources in excessively polluted areas by amending the Act.[3] *See* H.R.Rep. No.95–294, 95th Cong., 1st Sess. 207–11 (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 1077, 1286–90. The Clean Air Act Amendments of 1977, Pub.L.No.95–95, 91 Stat. 685, required the states to identify areas not meeting the national standards; these areas were designated "nonattainment" for each NAAQS that was violated. §§ 7407(d), 7501(2); 43 Fed.Reg. 8962 (Mar. 3, 1978). Congress offered nonattainment areas an opportunity for an extension of the deadline for complying with the national standards. But cognizant of the already lengthy history of delays and disappointments that had characterized previous efforts to combat pollution, Congress sought to build in some insurance that the NAAQSs would be met by the new deadlines. Taking into account past experience, Congress specified requirements that it believed would most likely result in eventual attainment. The price for the extension was the submittal of SIP revisions that would meet the stringent "Part D" requirements, added as Part D of Title I of the Clean Air Act by the 1977 Amendments. §§ 7501–7508.

**3.** *See Citizens for a Better Environment v. Costle,* 515 F.Supp. 264, 276 (N.D.Ill.1981); § 7410(a)(4).

**4.** EPA's Emission Offset Interpretive Ruling interpreted the 1970 Act as allowing new construction in areas with pollution levels exceeding NAAQSs as long as more than equivalent offsetting reductions will be obtained from existing sources, the new source's emissions will

Under Part D, the revised SIP must provide for the attainment of an NAAQS "as expeditiously as practicable" but not later than December 31, 1982. § 7502(a). The plan must provide for the adoption of all reasonably available control measures (RACMs) as expeditiously as practicable, reasonable further progress toward attainment during the interim period, the adoption of reasonably available control technology (RACT), a comprehensive inventory of the sources emitting the troublesome pollutant, and a permit system for construction and operation of new or modified major pollution sources. § 7502(b). Under a variation of EPA's "emission offset ruling,"[4] permits for new construction or modification of sources of the pollutant in the nonattainment area could be granted only if the increase in emissions is compensated for by a decrease in emissions from existing sources in the area and if the new source complies with the lowest achievable emission rate. § 7503.

In the case of areas that have not attained the NAAQSs for carbon monoxide or ozone,[5] an additional extension until December 31, 1987 may be granted for either or both of those pollutants if earlier attainment is not possible. § 7502(a)(2). Plans requesting this additional extension must provide for the implementation of a vehicle emission control inspection and maintenance program, establish an alternative site analysis program for construction or modification of major sources of the pollutant, and identify other measures needed to reach the NAAQSs by 1987. § 7502(b)(11). Another SIP revision to be submitted by July 1, 1982 must contain, in enforceable form, all measures needed for attainment. § 7502(c).

be controlled to the greatest degree possible, and continuing progress will be made toward the attainment of the NAAQSs. 40 C.F.R. Part 51 App. S (1981).

**5.** "Photochemical oxidants," *see* § 7502(a)(2), have been officially redesignated by EPA as "ozone." 44 Fed.Reg. 8220 (Feb. 8, 1979).

Congress sought to maximize the chances for success by subjecting states that chose not to submit Part D SIP revisions (or did not comply with the revisions) to a moratorium on major new source construction or modification that would contribute to concentrations of pollutants for which an area has been designated "nonattainment." The moratorium continues until the requirements of Part D are met. § 7410(a)(2)(I). Section 7502(a)(1) makes clear that the Part D SIP revisions "required by section 7410(a)(2)(I) [are] a precondition for the construction or modification of any major stationary source." *See also* §§ 7413(a)(5); 7503(4). "The statutory language and legislative history indicate that the [moratorium] is automatic and mandatory under the Act and existing state implementation plans, and is not a new prohibition that can be imposed or withheld at EPA's discretion." 44 Fed.Reg. 38471, 38472 (July 2, 1979). Accordingly, EPA promulgated a rule codifying this statutory restriction and adding it to all SIPs. 40 C.F.R. § 52.24(a), (b) (1981), 44 Fed.Reg. 38471 (July 2, 1979).[6]

To ensure that the new deadlines were not jeopardized at the start by the usual delays, Congress specified a precise schedule for the implementation of the 1977 Amendments. The states were to identify nonattainment areas by December 5, 1977. EPA was then to promulgate a list of nonattainment areas within sixty days (February 3, 1978). § 7407(d). States were required to submit Part D revisions by January 1, 1979. § 7502 note. The revisions were to take effect not later than July 1, 1979. As of that date, any major new construction would be governed either by a § 7503 permit system of an approved Part D submission or by the construction moratorium of § 7410(a)(2)(I).[7]

This precise timetable of Part D is superimposed upon the schedule for EPA responses to state submittals under the preexisting Clean Air Act. Section 7410(a)(2) provides that the Administrator of EPA "shall, within four months after the date required for a submission of a plan ... approve or disapprove [the] plan, or any portion thereof." Section 7410(c)(1) further requires EPA to promulgate a SIP or portion thereof in lieu of an acceptable submittal by a state "within six months after the date required for submission of [the state's] plan." The reference to administrative promulgation under § 7410(c) in § 7502(b)(1) makes clear that Congress envisioned some federal promulgation of Part D requirements, but the statute does not fully illuminate the interrelationship between § 7410(c) and Part D. *See* Currie, *Relaxation of Implementation Plans Under the 1977 Clean Air Act Amendments*, 78 Mich. L.Rev. 155, 186–87 (1979).

II. Connecticut's Part D Submissions

EPA designated the entire state of Connecticut as nonattainment for the ozone NAAQS and southwestern and central Connecticut as nonattainment for the carbon monoxide NAAQS. 43 Fed.Reg. 8962, 8977 (Mar. 3, 1978). The cities of Waterbury and Greenwich were also designated as nonattainment for total suspended particulates (TSP). *Ibid.*, as amended by 45 Fed.Reg. 84769, 84780, 84788 (Dec. 23, 1980). On June 22, 1979, almost six months after the date specified in the 1977 Amendments and only nine days before the EPA would have been required to approve or disapprove a timely submitted plan, Connecticut proposed revisions to its SIP to meet the re-

**6.** The 1977 Amendments also provide for the withholding of federal grants from states with nonattainment areas that do not meet the requirements of Part D. § 7506(a) (transportation grants); § 7616(b)(2) (sewage treatment grants).

**7.** EPA rules provide that EPA's Emission Offset Interpretive Ruling, as amended by § 7502 note, governs permits applied for before July 1, 1979. 40 C.F.R. § 52.24(c). After that date the

Ruling remains in effect in areas where the automatic construction moratorium of § 7410(a)(2)(I) does not apply, such as states developing Part D plans for areas designated nonattainment after March 3, 1978. 44 Fed. Reg. 20372, 20379 & n.36 (Apr. 4, 1979); *see* § 7502 note. A state must be carrying out all Part D requirements before the permit system it submits pursuant to § 7503 can replace the ban on new construction. § 7503(4).

quirements of Part D.[8] In response to requests by EPA, additional submissions were made on June 27, 1979, December 28, 1979, February 1, 1980, and May 1, 1980. Eleven months after it had received the proposed SIP revisions, EPA published a notice of proposed rulemaking. 45 Fed.Reg. 45080 (July 2, 1980). EPA proposed to approve much of the plan including extension of the attainment date for carbon monoxide and ozone until December 31, 1987. However, EPA found that seven of the statutory requirements were not fully met. EPA could not certify a plan with such deficiencies as in full compliance with Part D. But since state environmental officials had provided strong assurances that the deficiencies would be remedied, EPA proposed to approve the revisions conditionally pending correction of the inadequacies by specified deadlines.

Connecticut submitted additional revisions in September and November 1980. EPA then, nearly one-and-one-half years after the statutory deadline for final approval or disapproval of Part D revisions, "conditionally" approved Connecticut's SIP revisions. EPA determined that the revisions satisfied the requirements of Part D with five exceptions.[9] As to the five statutory requirements not fully complied with, EPA outlined specific and, in some instances, alternative steps that Connecticut could take to secure unqualified approval. Since Connecticut had given assurance that it would take these steps, EPA made the taking of such further action the "condition" on which the revision was approved. 45 Fed.Reg. 84769 (Dec. 23, 1980). The five statutory requirements remaining to be met were:

1. *Adoption of RACT for Ozone Attainment.* Since Connecticut is nonattainment for ozone, sources emitting pollutants contributing to concentrations of ozone must adopt RACT to insure reasonable further progress toward ozone attainment.[10] § 7502(b)(3). EPA has issued Control Technology Guidelines (CTGs) providing the state with assistance regarding techniques to control emissions of various volatile organic compounds (VOCs) that contribute to ozone pollution. The CTGs are not binding, but are a "presumptive norm."[11] If a state can formulate a different strategy for a particular VOC that results in roughly the same emission reduction as would EPA's CTG-recommended strategy, EPA will approve the alternative approach. 45 Fed. Reg. at 45082. EPA found that Connecticut's proposed SIP failed to adopt CTG-identified RACT for controlling two source categories of VOC emissions: cutback asphalt and solvent metal cleaning (degreasing).

Cutback asphalt is a road patching mixture that emits VOCs. EPA has determined that the emission of VOCs can be reduced by replacing petroleum solvents in cutback asphalt with a water-based emulsion mixture and that the changeover could be accomplished within a two-year period. 45 Fed.Reg. at 45082–83. Connecticut's plan did not contain any enforceable regulation to control the use of cutback asphalt. Furthermore, Connecticut proposed only to restrict state use of cutback asphalt and not to disturb municipal cutback asphalt use until 1987. Municipal use of cutback as-

---

8. EPA published its interpretative guidelines to the Part D requirements at 44 Fed.Reg. 20372 (Apr. 4, 1979).

9. The September and November submittals brought Connecticut into compliance with § 7502(b)(11)(C)'s requirement of identifying additional transportation control measures to be studied by states granted extensions for carbon monoxide or ozone attainment, 45 Fed.Reg. at 84775–76; 45 Fed.Reg. at 45085, and brought Greenwich into compliance with the TSP attainment demonstration requirement. 45 Fed.Reg. at 84780.

10. EPA has interpreted the Act to require certain stationary sources emitting precursors of ozone to adopt *all* RACT identified as available, whether or not all RACT is necessary for attainment or reasonable further progress. 44 Fed.Reg. 20372, 20375, 20376 (Apr. 4, 1979).

11. Part D submissions must take into account RACT identified in CTGs issued on or before January 1, 1978. Each January states are required to submit SIP revisions that take into account RACT identified in CTGs issued by the previous January. 44 Fed.Reg. at 20376.

phalt accounts for 28 times more tonnage of VOC emissions than state use. Consequently, EPA conditioned approval of the ozone attainment portion of Connecticut's SIP on the submittal by December 15, 1980 [12] of an adopted regulation controlling the use of cutback asphalt consistent with EPA guidance on RACT or an adequate justification for not following the CTG. 45 Fed.Reg. at 84772–73; 45 Fed.Reg. at 45082–83.

EPA found Connecticut's proposed regulations to control VOC emissions from solvent metal cleaning operations incomplete because the regulations did not contain labelling procedures as recommended by the CTG, exempted smaller operations contrary to the CTG, and used substantially different requirements than those suggested by EPA. EPA therefore additionally conditioned approval of the ozone attainment portion of Connecticut's SIP on the submittal by December 15, 1980 of a revision incorporating the RACT identified by EPA or a demonstration that Connecticut's rules would achieve roughly the same reduction in VOC emissions from solvent metal cleaning operations. 45 Fed.Reg. at 84773; 45 Fed.Reg. at 45083.

2. *Reasonable Further Progress Demonstration for Ozone Attainment.* Because Connecticut failed to include a SIP revision controlling cutback asphalt, EPA conditioned approval of the reasonable further progress requirement for ozone (§ 7502(b)(3)) on submittal of an acceptable cutback asphalt regulation by December 15, 1980. 45 Fed.Reg. at 84779–80.

3. *Stationary Source Inventory for VOC Emissions.* EPA conditioned its approval of Connecticut's emission source inventory (§ 7502(b)(4)) on the submittal by January 1, 1981 of a more refined inventory identifying the sources of various VOC emissions. Connecticut's original submission attributed more than 50% of certain VOC emissions to "miscellaneous industrial sources." 45 Fed. Reg. at 84779; 45 Fed.Reg. at 45088.

4. *Adoption of RACT for TSP Attainment in Waterbury.* EPA's New England Regional Office has identified RACT guidance for the following sources of TSP: oil burning boilers, asphalt batch plants, quarry operations, ferrous foundries, non-ferrous foundries, and portland cement concrete batch plants. EPA approved the TSP attainment plan conditioned upon adoption of the identified RACT for these sources by December 15, 1980 (March 15, 1981 for oil burning burners) or a demonstration of why adoption of RACT is not needed. EPA also conditioned approval upon a reexamination by December 15, 1980 of the existing regulations for fabricated metal products manufacturing, stone, clay, and glass products manufacturing, and textile mill products to see if RACT was being employed. EPA has no RACT guidance for these sources of TSP. 45 Fed.Reg. at 84781; 45 Fed.Reg. at 45090–91.

5. *Permit Requirements for New Construction and Modification of Major Stationary Sources.* The permit program required by § 7503 replaces the ban on major new source construction that is required by § 7410(a)(2)(I) prior to fulfillment of the requirements of Part D (including § 7503). EPA approved Connecticut's proposed permit system under two conditions to be satisfied by December 15, 1980. Connecticut would have to change its regulations so that in crediting emission offsets it counted allowable emissions rather than actual emissions. Under the statute a reduction in allowable as opposed to actual emissions (which in a nonattainment area may be excessive) must be achieved to offset emissions from proposed new sources. § 7503(1)(A). Second, EPA required Connecticut to limit its exemption for resource recovery facilities from the permit requirements to make it as strict as the similar exemption permitted under EPA's emission offset ruling. *See* 44 Fed.Reg. 20372, ·20379–80 (Apr. 4, 1979). Accordingly, EPA conditioned approval on a limitation of permits for major stationary sources, after the

**12.** The anomaly of EPA's December 23 approval conditioned on a December 15 submittal by Connecticut is caused by the time EPA needs to

analyze state revisions, propose final action, solicit notice and comment, and then take final action.

granting of an exemption for resource recovery facilities, until the resulting increase in pollution is offset. 45 Fed.Reg. at 84783; 45 Fed.Reg. at 45093.

With respect to all five sets of requirements, Connecticut environmental officials made written commitments to submit corrections by the specified deadlines. Connecticut submitted SIP revisions on December 15, 1980 to satisfy the RACT requirements for control of cutback asphalt and solvent metal cleaning operations and the permit requirements for new sources. Although we were not so informed by the parties, on September 25, 1981 (two days after oral argument) EPA filed a notice of proposed approval of these revisions as bringing Connecticut into full compliance with the requirements for adoption of RACT for ozone attainment, for demonstration of reasonable further progress toward ozone attainment, and for a permit system for major new stationary sources. 46 Fed. Reg. 47469 (Sept. 28, 1981).[13] EPA also approved Connecticut's refined inventory for stationary sources of VOCs; Connecticut submitted this revision on May 29, 1981, nearly five months after the deadline specified in EPA's conditional approval. *Ibid.* The parties also neglected to inform us of EPA's response to Connecticut's proposals to adopt RACT for TSP attainment, which were submitted on June 19, 1981, July 7, 1981, and August 5, 1981—many months after EPA's specified deadline. EPA proposed to approve the TSP attainment plan under its experimental "parallel processing" program[14] since once Connecticut's proposed regulatory changes are adopted by the state and formally submitted to EPA for incorporation into the SIP, Connecticut would be in compliance. 46 Fed.Reg. 56461 (Nov. 17, 1981).[15] Today, over 18 months after Part D plans were due to take effect and less than one year before one of the NAAQSs is supposed to be finally attained, Connecticut is still not in full and final compliance with Part D. Against this background of statutory requirements and steps towards compliance we consider the lawfulness of EPA's actions.

### III. Conditional Approval

Under EPA's conditional approval policy, a plan that is in "substantial compliance" with Part D may be conditionally approved as satisfying Part D if the state provides strong assurances that the remaining minor deficiencies will be remedied within a specified short period. Conditional approval operates to lift the § 7410(a)(2)(I) moratorium on major new construction or modification of stationary sources of pollution. If the state then fails to submit corrections by the specified date or submits corrections ultimately determined to be inadequate, the SIP will be disapproved and the construction moratorium reimposed. 44 Fed.Reg. 38583 (July 2, 1979); 44 Fed.Reg. 67182 (Nov. 23, 1979). EPA represents that con-

---

**13.** EPA accepted Connecticut's limitation of the cutback asphalt controls to the months of June through September, as well as its exemption for class 8 bituminous concrete and medium curing asphalt used as a penetrating prime coat. It also accepted Connecticut's justification for a program completion date of October 1, 1985.

**14.** The parallel processing program is designed to shorten EPA rulemaking actions by having EPA work closely with the states early in the approval process. Ideally, the state will propose a regulation and EPA and the state will concurrently conduct rulemaking processes. When the regulation is adopted by the state and submitted to EPA, it can then be processed by EPA as a final rulemaking since EPA has already conducted a notice and comment procedure. If the state regulatory process is excessively delayed, EPA may incorporate a proposed state regulation (or a proposed state regulation with appropriate revisions) into a SIP even though the state has not yet adopted the regulation. 46 Fed.Reg. 44476, 44477 (Sept. 4, 1981).

**15.** EPA approved Connecticut's proposed adoption of RACT for iron foundries, hot mix asphalt plants, and foundry sand processes. EPA also approved Connecticut's determination that existing regulations for non-ferrous foundries, quarry operations, and concrete batch plants applied RACT even though these regulations were not in strict conformity with EPA recommendations. EPA also found that Connecticut's existing regulations for fabricated metal products manufacturing; stone, clay, and glass products manufacturing; and textile mill products required RACT.

ditional approvals are not granted unless the existence of the deficiency, during the interim until unqualified approval, will not prevent the state from attaining a NAAQS and from making reasonable further progress toward attainment. EPA Brief at 30.

Petitioners claim that the literal "approve or disapprove" language of § 7410(a)(2) and the absence of any mention of conditional approvals in the Clean Air Act preclude EPA's conditional approval of a Part D submission. But this Court has held that an agency's power to approve conditionally is inherent in the power to approve or disapprove.

> [T]he power to condition ... approval on the incorporation of certain amendments is necessary for flexible administrative action and is inherent in the power to approve or disapprove. We would be sacrificing substance to form if we held invalid any conditional approval but affirmed an unqualified rejection accompanied by an opinion which explicitly stated that approval would be forthcoming if modifications were made.

*McManus v. CAB,* 286 F.2d 414, 419 (2d Cir.), *cert. denied,* 366 U.S. 928, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961). *McManus* involved the administration of a different statute by a different agency, but the underlying principles of administrative law are fully applicable here. Conditional approval offers administrative agencies a measured course that may be more precisely tailored to particular circumstances than the all-or-nothing choice of outright approval or disapproval. *Cf. United States v. Chesapeake & Ohio Ry.,* 426 U.S. 500, 514, 96 S.Ct. 2318, 2325, 49 L.Ed.2d 14 (1976).

■ In the context of the Clean Air Act, the conditional approval mechanism gives EPA the necessary flexibility to work more closely with the states, which, even after the 1977 Amendments, retain the primary responsibility for assuring air quality. § 7407(a). The need for flexibility in the administration of a statute whose provisions have been described as "virtually swim[ming] before one's eyes," *United States Steel Corp. v. USEPA,* 444 U.S. 1035, 1038, 100 S.Ct. 710, 711–712, 62 L.Ed.2d 672 (1980) (Rehnquist, J., dissenting from denial of certiorari), should not be underestimated. We have in the past been careful to defer to EPA's choice of methods to carry out its "difficult and complex job" as long as that choice is reasonable and consistent with the Act. *Friends of the Earth v. USEPA,* 499 F.2d 1118, 1124 (2d Cir. 1974). Even petitioners appear willing to concede that EPA would be able to use a conditional approval mechanism if the conditions operated as conditions precedent to final approval rather than conditions subsequent. Accordingly, we decline to construe the statute as permitting only outright approval or disapproval of state plans. Conditional approval is a direct adjunct of EPA's general responsibility for administration of the Act, § 7601(a),[16] and the more specific authority to approve or disapprove state plans, § 7410(a)(2).[17]

---

**16.** Section 7601(a) authorizes the Administrator "to prescribe such regulations as are necessary to carry out his functions under this chapter." Regulations under such empowering provisions are to be sustained as long as they are reasonably related to the purposes of the statute. *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973).

**17.** The Fifth Circuit has found support for the conditional approval mechanism in §§ 7410(a)(2)(H) and 7410(c)(1)(C). *City of Seabrook v. USEPA,* 659 F.2d 1349, 1353–57 (5th Cir. 1981). The Fifth Circuit inferred authority for conditional approval from the Administrator's power under § 7410(a)(2)(H) to require a state to revise its plan whenever the plan no longer is adequate to achieve a NAAQS or meet a requirement of Part D. It found further support in the Administrator's obligation under § 7410(c)(1)(C) to promulgate revisions whenever a state has neglected to revise its own plan as required by § 7410(a)(2)(H). Although these sections provide further evidence of Congress' concern for giving EPA flexibility to administer the Act, we decline to extend them beyond the context of revisions to plans that have already received unqualified approval. Section 7410(a)(2)(H), in our view, applies only to revisions of preexisting plans to take into account developments after the plans' original approval. The promulgating duty of § 7410(c)(1)(C) is explicitly tied to these § 7410(a)(2)(H) revisions of previously approved plans. We find sufficient authority for

We must be careful, however, not to permit EPA's use of the conditional approval procedure to circumvent substantive requirements of the 1977 Amendments. *Cf. Charette v. Bergland*, 84 F.R.D. 98, 102–03 (D.R.I.1979) (conditional approval cannot be used to circumvent explicit requirements of federal school breakfast program statute). While we must follow EPA's interpretation of the Clean Air Act as far as its construction is reasonable, *Train v. Natural Resources Defense Council, Inc., supra*, 421 U.S. at 75, 95 S.Ct. at 1479–80; *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), we are required to reject an interpretation contrary to the clear import of the statute, *Manchester Environmental Coalition v. EPA*, 612 F.2d 56 (2d Cir. 1979) (citing *TVA v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)). *FEC v. Democratic Senatorial Campaign Committee*, —— U.S. ——, ——, 102 S.Ct. 38, 40–42, 70 L.Ed.2d 23 (1981). EPA's "final," though conditional, approval of Connecticut's plan had two main practical effects.[18] First, although the record contains no evidence that in Connecticut there has been or is contemplated any "major" stationary source construction or modification, the conditional approval lifted the construction moratorium imposed by § 7410(a)(2)(I).[19] Second, the conditional approval may have satisfied any time or deadline requirements in the Act for EPA action on Connecticut's submittal and pretermitted any duty under § 7410(c) for EPA itself to promulgate rules to bring Connecticut into compliance with the requirements of Part D. Petitioners contend that these effects violate the explicit terms of the Clean Air Act and require that the conditional approval of Connecticut's plan be vacated.

### A. Lifting the Moratorium

EPA contends that continued imposition of construction restrictions no longer serves Congress' purpose once a state is in substantial compliance with Part D and is firmly committed to remedying outstanding deficiencies on a specified schedule. Since Congress' primary goals of state attainment and reasonable further progress toward attainment will not be compromised by the conditional approvals (the delay in full compliance having been found not to prevent attainment or reasonable further progress toward attainment), EPA reasons that Congress would not want the ban in effect in the interim. We disagree.

Congress in passing the 1977 Amendments went beyond merely mandating attainment of air quality standards. That approach had already failed. In light of past experience, Congress determined that a firmer guiding hand was needed to increase the chances for ultimate success. Hence, Congress chose to specify the precise track it wanted the states to take in reaching attainment. The construction moratorium is an important ingredient in the statutory scheme. Congress recognized that a major weakness in the 1970 Act was the failure to assess the impact of emissions from new sources on state plans to attain air quality standards by statutory deadlines. Too often states had permitted new construction on the assumption that, prior to statutory attainment deadlines, emissions

conditional approvals without relying on these two statutory provisions.

**18.** We are satisfied that the conditional approval in this case is "final action" reviewable under § 7607(b). *See City of Seabrook v. Costle*, 659 F.2d 1371, 1373 (5th Cir. 1981). The conditional approval was promulgated in a formal manner as a final rulemaking, cf. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 151, 87 S.Ct. 1507, 1516, 18 L.Ed.2d 681 (1967), and purported to have significant and irreversible consequences regarding the lifting of the ban on new construction and the time requirements of the Clean Air Act, cf. *Environmental Defense Fund, Inc. v. Johnson*, 629 F.2d 239, 241 (2d Cir.

1980); *National Wildlife Federation v. Goldschmidt*, 504 F.Supp. 314, 326 (D.Conn.1980).

**19.** In taking final action to approve conditionally Connecticut's submittal, 45 Fed.Reg. at 84785, EPA incorporated its earlier pronouncements governing the practical effects of conditional approvals, 44 Fed.Reg. 38583 (July 2, 1979); 44 Fed.Reg. 67128 (Nov. 23, 1979). These make clear that the moratorium on major new source construction is not to be imposed once a state's Part D submission is given conditional approval. *See* 44 Fed.Reg. 38584 (July 2, 1979).

could be reduced to compensate for any increase in pollution. S.Rep.No.95–127, 95th Cong., 1st Sess. 55 (May 10, 1977). The construction ban thus not only provides incentive for states to adopt the route Congress believed would lead to success, but also helps prevent further deterioration in nonattainment areas from major new sources of pollution until a plan meeting all requirements of Part D is in place, cf. id. at 25.

The terms of § 7410(a)(2)(I), which is the statutory provision triggering the construction moratorium, are absolute and unqualified. Every SIP must provide that

after June 30, 1979, no major stationary source shall be constructed or modified in any nonattainment area ... to which such plan applies, if the emissions from such facility will cause or contribute to concentrations of any pollutant for which a [NAAQS] is exceeded in such area, unless, as of the time of application for a permit for such construction or modification, such plan meets the requirements of part D of this subchapter (relating to nonattainment areas)

§ 7410(a)(2)(I). Similarly, § 7503(4) forbids the granting of permits for major new construction unless the requirements of Part D are being implemented in the nonattainment area, and § 7502(a)(1) describes the Part D requirements as a "precondition for the construction or modification of any major stationary source." EPA itself has concluded that "[t]he statutory language and legislative history indicate that the [moratorium] is automatic and mandatory under the Act and existing state implementation plans, and is not a new prohibition that can

be imposed or withheld at EPA's discretion." 44 Fed.Reg. 38471, 37472 (July 2, 1979).[20]

What little legislative history there is confirms our understanding of the moratorium provisions. The provisions did not emerge in final form until the Conference Committee Report. The conferees emphasized the relationship between approved Part D revisions and the moratorium: "As a condition for permitting major new sources to locate in a nonattainment area, States are required to have approved revised implementation plans." H.R.Conf. Rep.No.95–564, 95th Cong., 1st Sess. 121, 157, reprinted in [1977] U.S.Code Cong. & Ad.News 1502, 1537. The Conference Committee indicated that it "adopt[ed] much of the Senate's approach to the nonattainment problem." Clarifying Statement of Conference Committee on P.L. 95–95, 123 Cong. Rec. H8662 (Aug. 4, 1977), reprinted in [1977] U.S.Code Cong. & Ad.News 1570, 1573. The Senate's version of the ban had its origin in the recognition that a major weakness in the 1970 Act was the failure to control new source pollution. S.Rep.No.95–127, supra, at 55.

■ Congress has specified that the moratorium must remain in effect until a SIP revision fully complies with Part D. When Congress speaks as precisely as it has here, it is not for us or EPA to decide whether something else might be just or almost as good. Natural Resources Defense Council, Inc. v. EPA, 478 F.2d 875, 883 (1st Cir. 1973). Congress itself specified the techniques that it believed would lead to attainment and made them an inflexible precondition to major new construction.[21] By lifting the moratorium, EPA has legitimated,

**20.** Courts construing § 7410(a)(2)(I) have assumed that the ban is automatic after June 30, 1979. Citizens for a Better Environment v. Costle, 515 F.Supp. 264, 273 & n.10, 276–77 (N.D.Ill.1981); New England Legal Foundation v. Costle, 475 F.Supp. 425, 428, 430, 431 n.7, 432 (D.Conn.1979), aff'd, 632 F.2d 936 (2d Cir. 1980), and 666 F.2d 30 (2d Cir. 1981); cf. United States Steel Corp. v. USEPA, 595 F.2d 207, 216–17 (5th Cir. 1979) (temporarily exempting Alabama from automatic imposition of ban).

**21.** Even when an inflexible rule adopted by Congress posed the "potentially devastating

consequence[ ]" of forcing existing sources to close down (which is not the case here), the Supreme Court had no alternative but to defer to the clear will of Congress. Union Electric Co. v. EPA, 427 U.S. 246, 270, 96 S.Ct. 2518, 2531, 49 L.Ed.2d 474 (1976) (Powell, J., concurring). Even if EPA were correct that a "substantial compliance" exception to the construction moratorium would comport with Congress' primary goals, we are not the proper forum to which such policy arguments should be made. Frequently Congress adopts inflexible require-

albeit on a temporary basis, a deviation from Congress' chosen path toward attainment.[22] And if an unconditional approval is not forthcoming, the ban will have been relaxed without the state's ever having adopted all the requirements Congress thought necessary for timely attainment. These are the sorts of chances Congress deliberately chose not to take in the 1977 Amendments. After missing the deadlines once before, the states were to take the route specified by Congress if they were to avoid the construction moratorium.

Because EPA has used the conditional approval mechanism to circumvent this one substantive requirement of the Act,[23] we vacate that portion of the final order that prematurely lifted the construction moratorium.[24] EPA remains free to lift the ban when it determines that a plan *fully* complies with the requirements of Part D, even though implementing details of a plan remain to be furnished. *Cf. Friends of the Earth v. USEPA, supra.*[25] The ban need not apply to major sources emitting only pollutants for which Connecticut is in at-

---

ments, like the automatic ban on major new construction after a specified date, as "technology forcing" measures. *Union Electric Co. v. EPA, supra,* 427 U.S. at 257, 269, 96 S.Ct. at 2525, 2531 (quoting *Train v. National Resources Defense Council, Inc., supra,* 421 U.S. at 91, 95 S.Ct. at 1487). *See generally* Kramer, *The 1977 Clean Air Act Amendments: A Tactical Retreat From the Technology-Forcing Strategy?,* 15 Urban Law Annual 103 (1978).

22. Consider, for instance, a deficiency in a § 7503 permit plan. Under the conditional approval policy as expounded by EPA, the moratorium would be lifted even though a state was not yet implementing a permit system that complies with Part D. For the interim period until unconditional approval, the state could grant permits for major new construction that might cause more pollution than under a permit system fully complying with Part D. This would be in direct contravention of § 7503(4).

23. Neither *Friends of the Earth v. USEPA,* 499 F.2d 1118 (2d Cir. 1974), nor *City of Seabrook v. USEPA,* 659 F.2d 1349 (5th Cir. 1981), supports EPA's action concerning the moratorium. In *Friends of the Earth,* we upheld EPA's approval of New York's transportation control plan even though the plan lacked detailed implementing regulations. We were willing to allow EPA to rely on New York's firm commitment to adopt more specific regulations filling in the details of its plan for reducing parking in Manhattan. But critical to our decision in *Friends of the Earth* was the Administrator's determination that a delay in promulgating the regulations would not interfere with any substantive requirement of the Act. 499 F.2d at 1124. *Friends of the Earth* predated the 1977 Amendments' provision for additional substantive requirements and a construction moratorium preceding fulfillment of the requirements. While the delay in *Friends of the Earth* would not have undermined a requirement of the Act, the delay here, when combined with a premature lifting of the moratorium, violates a substantive requirement of the 1977 Amendments. In *City of Seabrook* petitioners presented the limited claim that conditional approval of Tex-

as' Part D submission violated the deadlines of the statute. 659 F.2d at 1352. The moratorium on construction was not analyzed.

24. While the imposition of a ban on construction may under some circumstances be within the jurisdiction of a district court to compel the Administrator to perform a nondiscretionary duty, § 7604(a)(2), we are satisfied that, in reviewing agency action under § 7607(b), our jurisdiction authorizes us to vacate that part of EPA's final rulemaking that had the effect of lifting the construction moratorium.

25. It is important to distinguish between a state plan provision that, although somewhat general in nature, *fully* complies with the Act's requirements and a state plan provision that, although in substantial compliance, is on its face inadequate to meet a requirement of the Act. The former situation is illustrated by EPA's full approval of a New York plan's provision for the implementation of a parking reduction plan in *Friends of the Earth, supra.* We construed the Act to permit EPA to require no more than this general commitment coupled with a promise to adopt more specific regulations in the future. Similarly, in this action EPA was willing to give full approval to Connecticut's provision for fugitive dust controls when coupled with an ambitious schedule for future implementation. 45 Fed.Reg. at 84781. In contrast, EPA found that Connecticut's plan was inadequate to meet the five explicit requirements of the Act that we have outlined *supra.* Connecticut's plan lacked anything that could be construed as complying with these requirements, not merely specific and immediately available *implementing* details. Of course, many requirements of the Act are not susceptible to *Friends of the Earth* analysis. For instance, a general commitment to achieve any of the five statutory requirements discussed *supra* would not qualify for full approval because, as EPA found, each requires specific implementing details at the time of final unqualified approval.

tainment, 40 C.F.R. § 52.24 (1981), or for which Connecticut has a fully approved Part D plan, e.g., carbon monoxide.

### B. Modifying the Time Limits

Petitioners also claim that conditional approval violates the strict time limitations built into the Act. With respect to this claim, however, we find that EPA's action, to the limited extent it is within our jurisdiction to review, is fully consistent with the Act. Mindful of the deference to be given an agency administering a statute, particularly "when the administrative practice at stake 'involves a contemporaneous construction of a statute by [those] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new,'" Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961) (quoting Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933)), we reject the claim concerning time limits.

In considering the claim that the conditional approval technique unlawfully modifies the time limits of the Act, we must distinguish between different types of time periods. The distinction affects not only the lawfulness of EPA's action but also determines which court has jurisdiction to remedy any unlawful action. On the one hand are time periods pertinent to a duty of EPA to promulgate its own SIP revisions or to act upon SIP revisions submitted by a state. A promulgation duty may arise after a state fails to meet the January 1, 1979 statutory deadline for submitting its Part D revisions, or fails to meet the deadline imposed by EPA for taking steps to satisfy the conditions of a conditionally approved revision. EPA's duty to act upon Part D revisions timely submitted to it is initially set by the Act as July 1, 1979, and may thereafter arise with respect to late Part D revisions by a state or state corrections submitted pursuant to the requirements of a conditional approval. Jurisdiction to enforce EPA's duty to promulgate its own

SIP revisions or to act upon the revisions or corrections submitted to it rests with the district court. § 7604(a)(2); see Citizens for a Better Environment v. Costle, 515 F.Supp. 264 (N.D.Ill.1981); Pacific Legal Foundation v. Costle, 14 Env't Rep. Cases 2121 (E.D.Cal.), aff'd, 627 F.2d 917 (9th Cir. 1980), cert. denied, 450 U.S. 914, 101 S.Ct. 1354, 67 L.Ed.2d 338 (1981).

On the other hand are the time periods pertinent to an assessment of the lawfulness of EPA's action in approving or conditionally approving a Part D revision. That assessment requires some scrutiny of the time periods EPA has approved for taking whatever steps were promised in an approved Part D revision or were promised to satisfy EPA's conditions for securing Part D approval. Jurisdiction to determine whether EPA has tolerated time periods of unreasonable delay rests with the court of appeals in exercising its authority to review final agency action. § 7607(b).

We have outlined the various time periods pertinent to litigation of this sort to highlight the narrow issues presented to this Court by petitioners' claim that conditional approval unlawfully modifies the time limits of the Act. We are not determining whether EPA could have been compelled at an earlier date to promulgate a Part D revision for Connecticut, nor whether EPA could have been compelled at an earlier date to act upon Connecticut's tardy submission. Instead we face two other issues. The first is whether the technique of conditional approval is unlawful whenever both the State and EPA fail to act within statutory time limits for submitting and approving a Part D revision, or whether the lateness requires EPA to reject any deficient aspects of the submission and promulgate a federal plan to remedy the deficiencies. The second issue is whether the use of the technique is unlawful in this case because of the particular time periods specified for Connecticut to meet the conditions for unqualified Part D approval. We do not find EPA's action unlawful in either respect.

■ Once a state has gone so far as to be in substantial compliance with Part D and has given firm assurances of its intent to remedy any minor deficiencies that remain, we believe Congress did not intend to require EPA to reject the state's revision and resort to federal promulgation under § 7410(c). So long as the construction ban remains in effect in the interim, we think the Act permits EPA to afford states an opportunity to implement their own plans and to correct whatever minor deficiencies remain. § 7407(a) (states have primary responsibility for assuring air quality); *Train v. Natural Resources Defense Council, Inc.,* *supra*; S.Rep.No.95–127, *supra*, at 10 (federal government does not have and will not have resources required to do an effective job of running pollution control programs for the states). EPA is entitled to interpret the Act to prefer "a commitment by the state to make the needed [minor] modifications" rather than "imposition of a federal plan." *City of Seabrook v. USEPA,* 659 F.2d 1349, 1356–57 (5th Cir. 1981). *Cf.* § 7410(c)(1)(C); *Utah International, Inc. v. EPA,* 478 F.2d 126, 127 (10th Cir. 1973) (*per curiam*) (EPA revision following disapproval after state fails to come up with revised plan of its own). In short, the statutory scheme gives a district court jurisdiction to determine whether to compel EPA to act if statutory deadlines are exceeded. But once the state has made its submission and EPA has assessed it as sufficient to meet its requirements for conditional approval,[26] the concern of a court of appeals is not how late EPA's action occurred, but whether the substance of the action satisfies the substantive requirements of the Act.[27] EPA's promulgation authority is not a punishment to be imposed for a late submission sufficiently complete to merit conditional approval.

■ The second issue is not a serious one on the facts of this case. Even if we assess the reasonableness of the period of delay tolerated in the conditional approval in light of the length of time that had already elapsed since the deadline for submission of Part D revisions, we cannot say that EPA has acted unlawfully in according Connecticut brief intervals to make relatively minor modifications.[28]

We therefore reject petitioners' challenges to EPA's conditional approval,[29] except to the extent that EPA lifted the construction moratorium.

---

26. We reject petitioner's contention that the conditional approvals here do not meet EPA's own prerequisites for conditional approval. The only administrative requirement challenged is the adequacy of Connecticut's assurance to correct the deficiencies. EPA's uncertainty regarding Connecticut's assurances, however, pertained only to the schedule for development and implementation of fugitive dust controls, which was fully rather than conditionally approved. 45 Fed.Reg. at 84781. Petitioners do not challenge EPA's finding that the delay tolerated by conditional approval will not interfere with attainment or reasonable progress toward attainment.

27. In reviewing EPA's conditional approval, we are not assessing the substance of any actions EPA took after conditional approval concerning Connecticut's attempts to satisfy the conditions. Those actions would be subject to our review at the time of EPA's unqualified approval.

28. Petitioners mistakenly assert that the conditions need not all be fulfilled until December 31, 1981. In fact, most of the conditions had deadlines in December 1980 (after being proposed in July 1980). The latest deadline was March 15, 1981, occasioned by the unavailability of EPA guidance material.

29. We reject petitioner's additional challenge to Connecticut's Part D submission on the ground that it does not include all RACMs as required by §§ 7502(b)(2) and 7502(a)(2). Petitioners have not met their burden of going forward with evidence that any particular measure not adopted by Connecticut is "reasonably available." *See Citizens for a Better Environment v. USEPA,* 649 F.2d 522, 529 (7th Cir. 1981); *Natural Resources Defense Council, Inc. v. USEPA,* 494 F.2d 519, 524–25 (2d Cir. 1974). Measures that are reasonably available as of 1982 must, of course, be included in Connecticut's 1982 Part D revision. As for the transportation control measures identified by Congress in § 7408(f) for EPA study, these are not automatic Part D requirements for every nonattainment area. EPA might determine, for instance, that a waste resource development program to reduce vehicle emissions from cold starts was not reasonably available as a pollution control measure in Hawaii. We reject *infra* the claim that an indirect source review program must be adopted as a RACM.

## IV. Indirect Source Review

Petitioners also contest EPA's approval of Connecticut's partial withdrawal of its indirect source review program (ISR) from its SIP. Indirect source review programs provide for preconstruction review of facilities that do not themselves pollute but that attract mobile sources of pollution. Shopping centers, sports complexes, highways, airports, and the like are reviewed for the increase in air pollution from motor vehicle traffic that they are likely to bring. In 1973, EPA required all states to revise their SIPs to include ISRs in response to the D.C. Circuit's decision in *Natural Resources Defense Council, Inc. v. EPA*, 475 F.2d 968 (D.C.Cir.1973). EPA promulgated regulations under § 7410(c), inserting ISRs into the SIPs of recalcitrant states. Congress reacted by adding riders to appropriations bills forbidding EPA to administer any ISR programs (except for airports and highways). *E.g.*, Pub.L.No.93–245, 87 Stat. 1071 (1974). In the 1977 Amendments, Congress sought to give the same relief to states that had voluntarily adopted ISR programs as part of their SIPs. Section 7410(a)(5)(A) provides that

(i) Any State may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.

(ii) Except [for major federally assisted or owned indirect sources], no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof.

(iii) Any State may revise an applicable implementation plan approved under this subsection to suspend or revoke any such program included in such plan, *provided that such plan meets the requirements of this section.* (emphasis added).

Connecticut was one of those states that had voluntarily adopted an ISR program as part of its SIP. In 1977, it amended its regulations to limit the scope of its ISR program to airports and major highway projects. EPA approved Connecticut's request for such partial withdrawal of the ISR program under § 7410(a)(5)(A)(iii). It found that Connecticut had complied with all procedural requirements of § 7410, which it believed was all that was required by the final proviso of § 7410(a)(5)(A)(iii). This Court reversed, ruling that EPA could approve a withdrawal of an ISR program from a SIP under § 7410(a)(5)(A)(iii) only if the state's "overall SIP complies with all of the requirements of § 7410—*both procedural and substantive.*" *Manchester Environmental Coalition v. EPA*, 612 F.2d 56, 59 (2d Cir. 1979) (emphasis in original). Connecticut could not withdraw its ISR program from a SIP whose success may have depended on the ISR. *Id.* at 60. We suggested that if EPA approved Connecticut's soon-to-be-submitted Part D revisions as in compliance with the Act, it would "kill [two] birds with a single administrative stone" since the revised plan would presumably not include an ISR. *Id.* at 61.

Connecticut renewed its request to withdraw its original ISR program when it submitted its Part D revisions. It sought to revise the program further by limiting its scope to review of major highway projects. When EPA conditionally approved Connecticut's Part D submittal, it approved Connecticut's partial withdrawal of ISR; it found that Connecticut's SIP both as an integrated whole and project by project met the requirements of § 7410. 45 Fed.Reg. at 84785.

Petitioners first contend that the ISR program cannot be withdrawn because Connecticut is not yet in full compliance with Part D. They rely primarily on our suggestion in *Manchester Environmental Coalition v. EPA, supra,* that when EPA determined that Connecticut's Part D-revised SIP complied with the Act, EPA would simultaneously approve the withdrawal of ISR. Since EPA has not yet certified Connecticut's SIP as in full compliance with Part D,

petitioners reason that the ISR withdrawal is premature.

█ The result in *Manchester Environmental Coalition* and the suggestion that we offered were intended only to ensure that the partial withdrawal of Connecticut's ISR program would not jeopardize the success of a SIP that depended in part on the ISR for attainment. 612 F.2d at 59–60. This time EPA has certified that Connecticut's SIP satisfies all the substantive requirements of § 7410 and Part D, except for the few minor deficiencies that occasioned conditional approval. None of the deficiencies relate to Connecticut's plan for carbon monoxide attainment, which has been given full approval. Because Connecticut's ISR program required review of indirect sources only for their contribution to carbon monoxide pollution, the success of Connecticut's SIP no longer depends on the ISR program. EPA has given full approval to Connecticut's plan to attain the carbon monoxide standard without a full ISR program. We therefore now see no reason why Connecticut cannot take advantage of the choice, which Congress evidently intended to give it, of withdrawing its ISR program.[30]

Petitioners next contend that the statutory authority to withdraw from ISR, contained in § 7410(a)(5)(A)(iii), does not apply to nonattainment states like Connecticut. They attempt to bolster this contention by a separate argument based upon § 7502(b)(2), which requires nonattainment states to "provide for the implementation of all reasonably available control measures as expeditiously as practicable" in nonattainment areas. Petitioners contend that ISR is a reasonably available control measure within the meaning of § 7502(b)(2), especially for Connecticut, since ISR was a control measure already included in Connecticut's SIP. Combining the arguments, petitioners contend that since § 7502(b)(2) requires Connecticut to use ISR as one form of RACM, Connecticut cannot be permitted to withdraw from ISR, and § 7410(a)(5)(A)(iii), which permits withdrawal, should therefore be construed to be inapplicable to Connecticut, if not to all nonattainment states.

We decline to adopt such a strained reading of § 7410(a)(5)(A)(iii), which on its face does not mention any exceptions to its coverage. Section 7502(b)(2), like § 7410(a)(5)(A)(iii), was enacted into law as part of the 1977 Amendments. We doubt that Congress intended implicitly to limit the scope of § 7410(a)(5)(A)(iii), which deals specifically with ISR withdrawal, by another provision of the same legislation that arguably includes ISR but makes no specific mention of it. If Congress intended to limit ISR withdrawal to attainment areas, it would have said so expressly. We do not believe that Congress silently and indirectly imposed a limiting scheme onto § 7410(a)(5)(A)(iii).[31] In fact the legislative history indicates that Congress rejected an interpretation of § 7410(a)(5)(A) similar to the one we are asked to adopt here. The House Bill would have allowed EPA to require some nonattainment states to adopt ISR programs. H.R.Rep.No.95–294, 95th

---

**30.** The extent to which motor vehicles contribute to ozone pollution is a matter of some controversy. There is some evidence that ozone pollution is related to total vehicle miles travelled and thus not susceptible to control by ISR programs, since such programs, with the possible exception of a preconstruction review of a highway program, which Connecticut is retaining, are more directed at preventing traffic congestion. There is further evidence that much of Connecticut's ozone problem may be caused by pollution from other states. In any event, since Connecticut's program to control ozone did not depend on ISR, its withdrawal should not jeopardize ozone attainment. Even if it could be demonstrated that ISR withdrawal incidentally increases ozone concentrations, Connecticut's many other Part D changes reducing ozone pollution make up for such a hypothetical incidental increase. Giving a state the choice of relying on other equally effective pollution-fighting measures instead of an ISR program was precisely what Congress sought to allow in passing § 7410(a)(5)(A)(iii).

**31.** Our suggestion in *Manchester Environmental Coalition v. EPA, supra,* that a plan could meet the requirements of Part D without an ISR program indicates that this Court has already implicitly rejected petitioner's construction of § 7410(a)(5)(A)(iii).

Cong., 1st Sess. 221–24, *reprinted in* [1977] U.S.Code Cong. & Ad.News 1077, 1300–03. The Conference Committee eliminated the exception and declared that EPA "would be prohibited outright" from requiring ISR programs. H.R.Conf.Rep.No.95–564, 95th Cong., 1st Sess. 121, 126, *reprinted in* [1977] U.S.Code Cong. & Ad.News 1502, 1506.

■ Petitioners point to language in subsections (a)(i) and (a)(iii) of § 7410(a)(5)(A) suggesting that the restrictions regarding ISR programs apply only to "plan[s] under this section [7410]" or "this subsection [7410(a)]." They suggest the reference to § 7410 as opposed to "the Act," which was the language in the House version of the legislation, demonstrates Congress' intent that § 7410(a)(5)(A) would not apply to nonattainment areas covered by Part D. We find two flaws in this argument. First, under the House Bill the restriction against EPA-required ISR did not apply to some nonattainment areas. H.R.Rep.No.95–294, *supra*, at 221–24. Therefore it cannot be argued that the final version of § 7410(a)(5)(A) was more limited and replaced a House version that would have applied across the board. The change was in precisely the opposite direction, broadening the restriction on requiring ISR. Second, Congress never intended to set up a separate process for EPA administration of states' Part D revisions. Section 7410(a)(2)(I) links Part D to the general SIP revision process. All SIPs are submitted under § 7410; if they are for nonattainment areas, the only difference is that Part D poses additional requirements. Therefore the references in § 7410(a)(5)(A) to plans submitted under § 7410 include submissions to meet the requirements of Part D.[32]

## Conclusion

The petition for review is granted in part. We vacate only that portion of EPA's De-

cember 23, 1980 order that impermissibly lifts the moratorium on major new construction or modification of stationary sources and remand for entry of a revised order consistent with this opinion.

---

**32.** In its Brief, EPA argues in the alternative that ISR is not a RACM since, among other reasons, it is "politically unacceptable." We have no need to reach the overall argument, but we categorically reject the notion that the political acceptability of a measure has any

relevance to whether the measure is "reasonably available" under § 7502(b)(2). *Cf. Natural Resources Defense Council, Inc. v. USEPA*, 494 F.2d 519, 524 (2d Cir. 1974) (rejecting social unacceptability test).